1  Daniel C. Girard (State Bar No. 114826)
   dcg@girardgibbs.com
2  Jonathan K. Levine (State Bar No. 220289)
   jkl@girardgibbs.com
3  Aaron M. Sheanin (State Bar No. 214472)
   ams@girardgibbs.com
4  Christina H. C. Sharp (State Bar No. 245869)
   chc@girardgibbs.com
5  **GIRARD GIBBS LLP**
   601 California Street, Suite 1400
6  San Francisco, CA 94108
   Telephone:  (415) 981-4800
7  Facsimile:   (415) 981-4846

8  Lead Counsel for Plaintiffs and the Proposed Class

9

10              **UNITED STATES DISTRICT COURT**

11          **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

12
   **In re Bank of America Corp. Auction Rate**   )  **MDL No. 09-2014 (JSW)**
13 **Securities Marketing Litigation**            )
                                                  )  **SECOND AMENDED CLASS ACTION**
14 This Document Relates to:                      )  **COMPLAINT FOR VIOLATIONS OF**
                                                  )  **FEDERAL SECURITIES LAWS**
15                                                )
   *Bondar v. Bank of America Corp.*              )
16                                                )  **Hon. Jeffrey S. White**
              No. C 08-2599 (JSW)                 )
17                                                )
                                                  )  **JURY TRIAL DEMANDED**
18                                                )
19 _____)

20

21                    **INTRODUCTION**

22       1.       Plaintiffs N.R. Hamm Quarry, Inc. and Ed O'Gara, by their undersigned counsel, allege

23 the following based upon personal knowledge as to their own acts and upon the investigation by their

24 counsel, which included, among other things, a review of:  (a) public statements, sales presentations, and

25 marketing materials of Bank of America Corporation, Banc of America Securities, LLC, and Banc of

26 America Investment Services, Inc. (collectively "Bank of America" or "Defendants"), and their

27 affiliates, agents, and employees; (b) Securities and Exchange Commission ("SEC") filings made by

28 Bank of America and other brokerages, financial services firms, and investment companies; (c) public

1  filings and statements in court proceedings and civil government and regulatory investigations involving
2  Bank of America and other brokerages, financial services firms, and investment companies; (d)
3  documents believed to be authentic copies of internal emails and other business records of various
4  brokerages, financial services firms, and investment companies obtained from public record sources;
5  (e) securities analysts' reports, press releases, and media reports; (f) interviews with purchasers of
6  auction rate securities and other knowledgeable individuals; and (g) discussions with consultants.

## INTRODUCTION

7
8       2.      This is a class action under Sections 10(b) and 20(a) of the Securities Exchange Act of
9  1934 ("Exchange Act") on behalf of all persons or entities who, between May 22, 2003 and February 13,
10 2008, inclusive ("Class Period"), purchased auction rate securities for which Banc of America Securities
11 served as sole auction dealer, lead auction dealer, co-lead auction dealer, or joint lead auction dealer
12 ("BA ARS"), or purchased auction rate securities from Banc of America Securities or Banc of America
13 Investments Services, and who were damaged thereby.

14      3.      Auction rate securities were bonds or preferred stocks that paid interest or dividends at
15 rates set at periodic auctions.  Auction rate securities allowed issuers to obtain long-term financing at
16 short-term interest rates, because investors reasonably expected to be able to access their principal at
17 each periodic auction.

18      4.      During the Class Period, and unbeknownst to investors, Defendants engaged in a scheme,
19 practice, or course of conduct (a) to manipulate the market for BA ARS to create the appearance that the
20 securities traded at arm's-length auctions, when in fact the available supply well exceeded the demand
21 for those securities and (b) to mislead auction rate securities buyers, through misrepresentations and
22 omissions of material fact, about the risks, value, and liquidity of those securities.

23      5.       As part of the scheme to manipulate the market for BA ARS, Banc of America Securities
24 maintained a policy of placing or causing the placement of support bids in every auction for which it
25 served as the sole auction dealer, lead auction dealer, co-lead auction dealer, or joint auction dealer, to
26 the extent necessary to create the appearance of stability and liquidity in the auction market, prevent
27 auction failures, and set the rates of interest or dividends paid on those securities.  In addition, Banc of

28

Case No. CV-08-2599 (JSW)
SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

1   America Securities and Banc of America Investment Services falsely described auction rate securities,

2   including BA ARS, as highly liquid investments that were appropriate for short-term investing, when the

3   market for those securities was sustained by Defendants' manipulative conduct.

4         6.    The goal of the scheme was to allow Defendants to underwrite billions of dollars of BA

5   ARS and to sell those securities, including Defendants' own inventory, at par value when they were

6   worth significantly less.  The scheme allowed Defendants to reap hundreds of millions of dollars in

7   underwriting and auction dealer fees at the expense of investors who purchased BA ARS at inflated

8   prices.

9         7.    Defendants' scheme came to light on February 13, 2008, when the auction rate securities

10   market collapsed after Banc of America Securities and the other major auction dealers abruptly ended

11   their policy of propping up the market.   Since that date, the purported auctions previously managed by

12   Banc of America Securities have ceased operating, and Defendants have admitted there is no prospect of

13   the purported auctions resuming operations, as there is no demand for BA ARS.   Defendants'

14   withdrawal of "support" for the auction market left Plaintiffs and Class members holding billions of

15   dollars in illiquid auction rate securities, including BA ARS.

16   **JURISDICTION AND VENUE**

17         8.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C.

18   §§ 1331 and 1337, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).  The claims asserted herein

19   arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule

20   10b-5 promulgated thereunder by the SEC (17 C.F.R. 240.10b-5).

21         9.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C.

22   §§ 1391(b) and 1337.  Defendants regularly conduct business within this District, and many of the acts

23   giving rise to the violations complained of herein took place in this District.

24         10.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly,

25   used the means and instrumentalities of interstate commerce including but not limited to the mails,

26   interstate telephone communications, and the facilities of the national securities markets.

27

28

## PARTIES

**A.**   **Plaintiff**

11.      Plaintiff N.R. Hamm Quarry, Inc. ("Hamm"), as set forth in its certification attached hereto and incorporated by reference herein, purchased auction rate securities, including BA ARS, from Banc of America Securities, LLC during the Class Period, and was damaged thereby.  Plaintiff Hamm continues to hold illiquid auction rate securities, including BA ARS.

12.      Plaintiff Ed O'Gara ("O'Gara"), as set forth in his certification attached hereto and incorporated by reference herein, purchased BA ARS from TD Ameritrade, and was damaged thereby.  Plaintiff O'Gara continues to hold illiquid BA ARS.

13.      Unless specifically noted, "Plaintiffs" refers collectively to plaintiffs Hamm and O'Gara.

**B.**   **Defendants**

14.      Defendant Bank of America Corporation ("BAC") is incorporated in North Carolina and maintains its principal executive offices in Charlotte, North Carolina.  BAC is a bank holding company and a financial holding company registered under the Gramm-Leach-Bliley Act.  BAC is one of the world's leading financial firms and one of the largest banks in the United States by assets.  BAC conducts substantial business within this District.  BAC conducts business through its wholly owned subsidiaries including Banc of America Securities, LLC and Banc of America Investment Services, Inc.

15.      Defendant Banc of America Securities, LLC ("BAS") is incorporated in Delaware and maintains its principal executive offices in Charlotte, North Carolina.  BAS is registered with the SEC as a broker-dealer pursuant to Section 15(b) of the Exchange Act and is a member of the New York Stock Exchange ("NYSE") and the Financial Industry Regulatory Authority ("FINRA").  BAS is a wholly owned subsidiary of BAC.  BAS conducts substantial business within this District.  BAS underwrote, managed auctions for, and sold auction rate securities, including BA ARS, to Class members during the Class Period.

16.      Defendant Banc of America Investment Services, Inc. ("BAIS") is incorporated in Florida and maintains its principal executive offices in Charlotte, North Carolina.  BAIS is registered with the SEC as a broker-dealer pursuant to Section 15(b) of the Exchange Act and is a member of the

NYSE and the FINRA.  BAIS is a wholly owned subsidiary of BAC.  BAIS conducts substantial business within this District.  BAIS sold auction rate securities, including BA ARS, to Class members during the Class Period.

17.     Unless specifically noted, "Bank of America" or "Defendants" refers collectively to defendants BAC, BAS, and BAIS.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

18.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of a class consisting of all persons and entities that, between May 22, 2003 and February 13, 2008, inclusive, purchased auction rate securities for which BAS served as sole auction dealer, lead auction dealer, co-lead auction dealer, or joint lead auction dealer, or purchased auction rate securities from BAS or BAIS, and who were damaged thereby (the "Class").

19.     Excluded from the Class are Defendants; the subsidiaries and affiliates of any Defendant; any person or entity who is a partner, officer, director, employee, or controlling person of any Defendant; members of Defendants' immediate families and their legal representatives, heirs, successors, or assigns; and any entity in which any Defendant has or had a controlling interest.

20.     The members of the Class are so numerous that joinder of all members is impracticable.

21.     Prior to the collapse of the auction rate securities market, BAS served as an auction dealer for such securities.  During the Class Period, BAS and BAIS sold auction rate securities, including BA ARS, to thousands of customers, including retail clients, charities, small to mid-sized businesses, larger corporations, and institutional customers.  During the Class Period, Defendants' investor clients held more than $9 billion of auction rate securities, including BA ARS.

22.     While the exact number of Class members is unknown to Plaintiffs at this time but can readily be ascertained through discovery of records maintained by Defendants and non-parties, Plaintiffs believe that there are thousands of members of the proposed Class who hold billions of dollars in outstanding auction rate securities, including BA ARS.

23.     Record owners and other members of the Class may be identified from records maintained by Defendants and other brokerage firms and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

24.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

    (a)    Whether the federal securities laws were violated by Defendants' acts as alleged herein;

    (b)    Whether Defendants joined, directed, participated in, or otherwise engaged in a scheme to defraud purchasers of BA ARS during the Class Period;

    (c)    Whether Defendants manipulated the market for BA ARS during the Class Period;

    (d)    Whether Defendants made omissions or misrepresentations of material fact about the risks, value, and liquidity of auction rate securities and the market for such securities;

    (e)    Whether Defendants failed to disclose that they artificially supported and manipulated the market for auction rate securities, including BA ARS, to maintain the appearance of liquidity and stability, and other facts relating to those securities, and if so, whether the omitted facts were material; and

    (f)    Whether Class members have sustained damages and the proper measure of damages.

25.     Plaintiffs' claims are typical of the claims of the members of the Class, as Plaintiffs and all members of the Class have been similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

26.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

27.     A class action is superior to all other available methods for the fair and efficient adjudication of Plaintiffs' claims.  The damages suffered by individual Class members are relatively small given the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' conduct.  It would be virtually impossible for members of the Class to individually redress the wrongs done to them.

28.     Furthermore, even if Class members could afford such individualized litigation, the court system could not.  Individualized litigation would create the danger of inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties, is in fact manageable, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. The benefits of adjudicating this controversy as a class action far outweigh any difficulties in managing the Class.

29.     In the alternative, the Class may be certified under the provisions of Fed. R. Civ. P. 23(b)(1), 23(b)(2), and/or 23(c)(4) because:

(a)     The prosecution of separate actions by the individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members which would establish incompatible standards of conduct for Defendants;

(b)     The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests;

(c)     Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole; and

(d)     The claims of Class members are comprised of common issues that are appropriate for certification under Rule 23(c)(4).

## FACTUAL ALLEGATIONS

**A.     Background**

**i.     Auction Rate Securities**

30.     Auction rate securities were long-term or perpetual variable-rate equity or debt instruments that paid interest or dividends at rates set at periodic "auctions."

31.     Auction rate securities were issued by closed-end preferred funds; states, state agencies, municipalities, or other governmental authorities; public or private student loan originators and lenders; and other corporations and entities.

32.     The market for auction rate securities experienced dramatic growth since the securities were first introduced in 1984.  At the end of 2005, approximately $263 billion of auction rate securities

were outstanding.  In the subsequent 26 months, the auction rate securities market grew by nearly 25 percent.  By February 2008, the market for auction rate securities exceeded $330 billion.

33.     When auction rate securities were first introduced in the mid-1980s, they were available only to highly sophisticated institutional investors with required minimum purchases of $250,000 or more.  Prior to the beginning of the Class Period, issuers and underwriters lowered the minimum investment to $25,000.  The reduced minimum investment enabled sellers to market auction rate securities to retail investors including individuals, charities, and small businesses.

**ii.     The Auction Process**

34.      Prior to February 2008, auction rate securities typically traded at par value through periodic "Dutch" auctions generally held every 7, 28, 35, or 49 days.  The auctions determined which investors would own the securities as well as the "clearing rate," the rate of interest or dividends paid on those securities until the next periodic auction.  Auction procedures typically allowed participants to submit orders to buy, sell, or hold auction rate securities.

35.     Auction rate securities allowed issuers to obtain long-term financing at less expensive, short-term rates.  Auction rate securities purchasers were willing to accept short-term rates because they reasonably believed that auction rate securities could readily be disposed of at par through the periodic auctions.

36.     Issuers of auction rate securities selected and paid firms, including BAS, to act as the dealer through which investors submitted orders at auctions for the issuers' securities.  The firm selected to receive bids was called an "auction dealer," "broker-dealer," or "auction manager," and was said to "participate" in auctions.[1]  Investors also could place orders at auctions through other designated brokerages, often referred to as "remarketing agents" or "distributing firms," which then would transmit those orders to the auction dealer.  The firm that underwrote an issuance of auction rate securities typically served as auction dealer for those securities.

37.     In a successful auction, the number of shares bid for purchase at a particular rate was equal to or greater than the number of shares offered for sale at that rate.  All shares for sale were

---

[1]     The term "auction dealer," as used in this Complaint, is intended to be synonymous with the terms, "broker-dealer" and/or "auction manager."

purchased, and the clearing rate, i.e., the lowest interest or dividend rate at which all sale orders could be fulfilled, applied to all securities sold until the next auction.  An auction failed if the number of shares offered for sale exceeded the number of shares bid for purchase.

38.     If the auction failed, then none of the current holders could sell their shares, as auction rate securities have no "put" feature guaranteeing that an investor can either sell the securities back to the auction dealer on demand at par value or force the issuer to redeem the securities.  If an auction failed, however, the holder of an auction rate security was entitled to collect dividends or interest at a predetermined rate until the next auction.  The predetermined rate of interest that was paid in the event of a failed auction was typically referred to as the "maximum rate."

39.     The maximum rate was intended to ensure that the auction rate security remained liquid if the auction failed, by attracting new buyers or prompting the issuer to refinance.  If the maximum rate was insufficient to attract liquidity in the event of an auction failure, however, the risk characteristics of the auction rate security were fundamentally altered.  An auction rate security that carried a low maximum rate was entirely dependent on the auction dealer's intervention and "support" for the periodic auctions to ensure liquidity, and in the absence of the auction dealer's support, any auction failure would render the security illiquid, as the maximum rate could not be counted on to attract new buyers or prompt the issuer to refinance.

**B.      Bank of America Engaged In A Scheme To Defraud Purchasers Of Auction Rate Securities**

40.     Defendants were actively involved in the auction rate securities market throughout the Class Period.  BAS served as an underwriter for auction rate securities and served as the sole auction dealer in "sole-managed" auctions (where only one auction dealer was signed up to participate), and as a lead auction dealer, co-lead auction dealer, or joint lead auction dealer in "multi-dealer" auctions (where multiple auction dealers were signed up to participate).  BAS and BAIS sold auction rate securities, including BA ARS, to investor clients.

41.     During the Class Period, BAS underwrote billions of dollars of auction rate securities, placing additional supply in an already saturated market.  To accommodate the demands of issuers and obtain high credit ratings even as underwriting standards deteriorated over the course of the Class

1    Period, BA ARS were issued with maximum rates that were capped at insufficient levels to attract

2    liquidity in the event of an auction failure.   Therefore, BAS needed to suppress auction failures to

3    prevent these low maximum rates from becoming widely known to auction rate securities investors.

4         42.     Throughout the Class Period, Defendants engaged in deceptive and manipulative tactics

5    directed at auction rate securities investors to create the appearance of a functioning auction market in

6    which auction rate securities traded in accordance with actual supply and demand.   Defendants'

7    manipulative conduct included:  (1) maintaining a policy of intervening in every auction for which BAS

8    served as the sole or lead auction dealer, to the extent necessary to prevent the auction from failing, to

9    create the appearance of stability in the auction rate securities market and to mask the inherent illiquidity

10   of auction rate securities, including BA ARS; (2) making false and misleading statements and

11   incomplete disclosures about the liquidity of BA ARS and BAS's role in propping up the auction rate

12   securities market; (3) routinely intervening in auctions to set the rates of interest or dividends paid on

13   those securities and deprive investors of the information necessary to assess the risk and volatility of BA

14   ARS; and (4) directing their brokers to promote and sell BA ARS through material misreprsentations

15   and omissions.

16        43.     The scheme began to unravel when auction dealers allowed a discrete segment of the

17   auction rate securities market to fail, as credit markets weakened in the summer and fall of 2007.  When

18   these auctions failed, many institutional investors began liquidating their positions in auction rate

19   securities, and the overall deterioration in credit markets led to further selling pressure from corporate

20   and retail holders of auction rate securities.  In response, BAS and BAIS expanded the range and extent

21   of their manipulative practices in an attempt to simultaneously prop up the remainder of the auction rate

22   securities market, conceal the liquidity characteristics of BA ARS, and protect Defendants from the

23   consequences of their policy of intervening in the auctions.

24       **i.**     **BAS Maintained A Practice Of Intervening In Every Auction For Which It Was The Sole Or Lead Auction Dealer, If Necessary To Prevent The Auction From Failing, To Create The Appearance Of Stability And Liquidity**

25

26        44.     Throughout the Class Period, BAS used its own capital to place "support bids" in

27   auctions in which it served as the sole auction dealer or as the lead auction dealer in multi-dealer

28

auctions.  The placement of such support bids was done pursuant to a tacit understanding among BAS and the issuers of BA ARS that the auction dealer would act to prevent auction failures.

45.    Through the placement of these support bids, BAS purchased BA ARS for its own account when the auctions otherwise would have failed due to lack of sufficient demand.

46.    Until around February 13, 2008, BAS followed a uniform policy of placing support bids, if needed to prevent auction failures, in every auction for which it was sole or lead auction dealer.

47.    BAS was able to place support bids and prevent auctions from failing, because it was aware of the other bids in the auctions and could place its own bids after the bidding deadline for other investors.

48.    BAS failed to disclose to investors that it invariably placed support bids in every auction for which it was the sole or lead auction dealer during the Class Period as necessary to prevent auction failures, that it did so pursuant to a tacit agreement with the issuer that it would suppress auction failures, and that the impact of its extensive and sustained interventions created the outward appearance that BA ARS were readily liquid investments and that the auction market functioned by the natural interplay of supply and demand.

49.    By intervening to prevent auction failures, BAS masked the liquidity risks inherent to BA ARS.  Due to the lack of transparency in the auction market, Class members had no way of knowing the extent to which BAS's interventions were needed to sustain the auction rate market and ensure that auctions continued to clear.

50.    Had BAS not supported these auctions, or had BAS disclosed the extent of its interventions, widespread auction failures would have alerted the public to the true risk characteristics of the auction rate securities for which BAS served as an auction dealer.  Instead, BAS's actions created a "façade of liquidity," leading purchasers of auction rate securities to believe their investments could be readily liquidated through arm's- length sales at periodic auctions.

**ii.    BAS Routinely Intervened In Auctions To Set The Rates of Interest Paid On BA ARS**

51.     BAS set the clearing rate for the auctions that would have failed but for its support bids throughout the Class Period.  For each auction, BAS knew all the bids that had been placed by both

holders and prospective buyers of the securities.  Armed with this information, BAS placed buy bids at specified rates and in sufficient amounts that ensured the auction would clear at those rates.

52.   Throughout the Class Period, BAS set interest rates in such a manner as to promote continued sales of auction rate securities to the public, but without letting clearing rates become or remain so high as to alienate the issuer clients on whom BAS depended for continuing business and attendant underwriting commissions and auction dealer fees.

53.   By intervening in the auctions, BAS set the clearing rate but also added BA ARS to its own inventory.  BAS, BAIS, and distributing firms then reduced the excess inventory between auction periods by selling BA ARS at the clearing rate that BAS had established at the previous auction.

54.   Because purchasers of income securities such as bonds and preferred stocks consider higher interest rates to be an indicator of higher risk, BAS's interventions to manage interest rates and suppress auction failures deprived investors of objective information that they needed to evaluate the true risk characteristics of BA ARS.

55.   Thus, BAS's conduct in rigging the clearing rates sent a false signal about the fair price and liquidity of BA ARS.

**iii.   During The Class Period, BAS And BAIS Omitted Material Facts About BAS's Role In The Auction Market And Materially Misrepresented The Liquidity Of And Risks Associated With Auction Rate Securities**

56.   As part of the fraudulent scheme alleged herein, BAS and BAIS made false and misleading statements of material fact and omissions of material fact about auction rate securities, including BA ARS, to the investing public..

57.   To perpetuate the auction rate securities market and sustain BAS's business underwriting auction rate securities and managing auctions, BAS and BAIS directed their brokers throughout the United States to represent to investors in written materials and uniform sales presentations that auction rate securities were equivalent to cash and were safe, highly liquid, and appropriate as short-term investment vehicles suitable for any investor with at least $25,000 of available cash and as little as one week in which to invest.

58.     BAS and BAIS knew that auction rate securities were not highly liquid short-term investments, however.  Since at least March 2005, the "Big Four" accounting firms—including Bank of America's own auditor, PricewaterhouseCoopers LLP—the Financial Accounting Standards Board ("FASB"), and the SEC had determined that auction rate securities did not qualify as "cash equivalents." According to the SEC, "because the auction rate securities have long-term maturity dates and there is no guarantee the holder will be able to liquidate its holdings, these securities do not meet the definition of cash equivalents in paragraphs 8 and 9 of FASB Statement No. 95, *Statement of Cash Flows*."

59.     Pursuant to management directives, BAS's and BAIS's brokers sold auction rate securities, including BA ARS, without disclosing the following material facts about those securities before or at the time of sale:

(a)     Auction rate securities, including BA ARS, were not cash alternatives, but were long-term financial instruments;

(b)     With the exception of some auction rate securities with maximum rates high enough to attract liquidity or cause the issuer to refinance, auction rate securities, including BA ARS, lacked features designed to ensure the holder's ability to sell the security, and in the event of an auction failure, the purchaser would be required to hold the security to maturity or indefinitely;

(c)     Many auction rate securities, including BA ARS, were subject to interest rate caps, which if triggered, would reset their interest rates to levels well below market rates for comparable securities, often as low as zero, and render those securities unmarketable.

(d)     Auction rate securities, including BA ARS, appeared readily liquid at the time of purchase and sale only because BAS and other auction dealers were artificially supporting and manipulating the auction market to maintain the appearance of liquidity and stability;

(e)     The short-term nature of auction rate securities, including BA ARS, and the ability of investors to liquidate those securities at par depended on the perpetuation of the artificial auction market by BAS and the other auction dealers;

(f)     BAS and other auction dealers had reached a tacit or express understanding that the interests of each auction dealer would be served by intervening where possible to suppress auction failures, and pursuant to that understanding, BAS systematically intervened to prevent auction failures, thereby making BA ARS appear more liquid than they in fact were, and concealing the extent to which BA ARS were dependent on BAS's continued intervention to remain liquid;

(g)     The periodic auctions at which the rates of interest or dividends on auction rate securities, including BA ARS, were set required that investors actively bid their securities to maximize the rate of return on their investments and minimize the impact of manipulative conduct by BAS and other auction dealers, and in the absence of the investor's active participation in the time consuming and highly specialized process of monitoring "price

talk" and the bidding process, investors were likely to earn interest or dividends at reduced rates; and

(h)    In the event of persistent auction failures, the auction rate securities, including BA ARS, would be saleable only at a substantial discount from their purchase price, if at all.

60.    Pursuant to management directives, BAS's and BAIS's brokers sold auction rate securities, including BA ARS, without disclosing the following material facts about BAS's role in the auctions and the auction market in which those securities were traded before or at the time of sale:

(a)    The auction market operated without transparency to investors, thus enabling manipulation by BAS, as well as other auction dealers;

(b)    The "auctions" for auction rate securities were not true auctions, as BAS and other auction dealers submitted "support" bids and engaged in other manipulative practices for their own accounts in auctions that would have otherwise failed during the Class Period, did so with knowledge of the other bids in the auctions, and often did so after the bidding deadline imposed on other investors;

(c)    BAS directly or indirectly set the clearing rate in most of the auctions in which it submitted bids during the Class Period;

(d)    BAS managed the interest rates for BA ARS to ensure that rates of interest or dividends paid were at levels sufficiently low to attract continued interest from BAS's issuer clients in subsequent BA ARS issuances, while paying sufficient interest to make BA ARS saleable to retail investors;

(e)    By manipulating the auctions for BA ARS, BAS prevented Class members from learning the true risk, value, and liquidity features of those securities;

(f)    BAS and BAIS intended to continue to market auction rate securities, including BA ARS, as cash equivalent and highly liquid, safe investments, even if they determined that BAS and other auction dealers were likely to stop supporting and manipulating the auctions at any time; and

(g)    Purchasers of auction rate securities, including BA ARS, were expected to monitor the auctions at all times to protect their interests, as BAS and other auction dealers considered themselves free to "manage" auction outcomes and withdraw their support for the auctions at any time.

61.    Pursuant to management directives, BAS's and BAIS's brokers sold BA ARS without disclosing the following material facts about the conflicts of interest between Defendants' brokerage and investment banking operations with respect to BA ARS before or at the time of sale:

(a)    Defendants allowed the interests of their investment banking operations, which underwrote and managed auctions for BA ARS in exchange for lucrative underwriting commissions and auction management fees, to prevail over the obligations of fair dealing and full disclosure of its brokerage operations; and

(b)    BAS managed interest rates to ensure that the rates paid on BA ARS were high enough to attract buyers, but low enough not to upset the issuer clients for whom BAS had

underwritten the auction rate securities offerings and to whom BAS had made express and implied commitments that it would manage rates within acceptable levels and prevent auction failures.

62.     Defendants' brokers failed to disclose the information in paragraphs 59-61 above to investors, because they had not been provided with that information by Defendants during the Class Period.

63.     As a result, Defendants' brokers lacked even a rudimentary understanding about auction rate securities, including BA ARS, and how the auction rate securities market functioned during the Class Period.

64.     Furthermore, BAS's and BAIS's practice was not to deliver a prospectus to Class members who purchased auction rate securities, including BA ARS, at periodic auctions, as Defendants treated such purchases as "secondary market sales" exempt from the prospectus delivery requirement.

65.     Defendants did not provide prospectuses to investors who purchased BA ARS from distributing firms, or require the disclosure of any other material information to such purchasers by the distributing firm.

66.     BAS acknowledged in certain written disclosures that it might intervene in auctions, but suggested that it did so only sporadically.  BAS did not disclose the extent of its interventions, the purpose of its interventions, or the impact of its interventions on the market for BA ARS, and the attendant risks of acquiring auction rate securities.  BAS failed to provide disclosures of any kind to investors who purchased BA ARS from distributing firms, even though it knew that the distributing firms would not be disclosing the facts surrounding BAS's interventions in the periodic auctions for BA ARS.

67.     Thus, during the Class Period, BAS never disclosed that it maintained a policy of placing support bids as needed to suppress auction failures in every auction for which it served as sole or lead auction dealer, that these support bids masked the lack of liquidity in the market, and that the auctions would fail without these support bids.

### iv.     BAS Withdraws From The Auction Rate Securities Market

68.     When the credit market deteriorated in the summer of 2007, several major auction dealers, including UBS, Merrill Lynch, Lehman Brothers, and Deutsche Bank, chose not to intervene to

prevent failures of auctions for certain auction rate securities that credit markets viewed as particularly undesirable.

69.    Following these auction failures, BAS continued to monitor the industry for auction failures by other auction dealers throughout the fall of 2007 and into early 2008.  BAS and other auction dealers continued to support the auction rate securities market until they collectively abandoned it in February 2008.

70.    Around February 13, 2008, BAS and all other major auction dealers of auction rate securities withdrew their support for the auction rate securities market.  As a result, 87% of all auctions of auction rate securities failed.

71.    At no time before then did BAS notify Class members or publicly announce that it intended to withdraw its support for the BA ARS market.

72.    As a result of the withdrawal of support by BAS and other auction dealers, the auction rate securities market has permanently collapsed, rendering outstanding auction rate securities, including BA ARS, illiquid.

**C.    Defendants Acted With Scienter**

**i.    Auction Rate Securities Were Lucrative For Defendants**

73.    As a significant underwriter and auction dealer of BA ARS during the Class Period, BAS earned substantial fees for its services from the issuers of those securities.

74.    To compensate BAS for its underwriting services, issuers typically paid it at least 25 basis points on the face value of the securities underwritten.

75.    Pursuant to agreements with the issuers and/or auction agents, BAS generally served as an  auction dealer for the auction rate securities it had underwritten and was paid an annualized auction dealer fee for managing auctions.

76.    Issuers typically paid BAS auction management fees of between 15 and 25 basis points per year on the amount of auction rate securities for which BAS acted as an auction dealer.

**ii.     BAS Took Advantage Of The Opportunity To Manipulate The Market For BA ARS**

77.     Unlike fixed-rate bonds, commercial paper, or money market funds, auction rate securities were designed with the understanding that the holder would actively "trade" the securities by monitoring the rates of return paid on auction rate securities in relation to other short-term investment options available to the holder, and "roll at rate" (an instruction to sell unless the rate paid on the security is equal to or greater than a specified rate of interest) or sell the security outright if the rate the holder anticipates receiving on the auction rate security is inferior to other alternatives.

78.     Because purchasers of BA ARS were not the institutional buyers who were originally intended to serve as the target buyers of auction rate securities, in the absence of active trading by holders, BA ARS became increasingly vulnerable to intervention by BAS, in its capacity as an auction dealer, to influence interest and dividend rates and create the appearance of liquidity.

79.     Before an auction took place, BAS surveyed investor interest and provided guidance, known as "price talk," to potential investors about the range of rates within which it expected the auction to clear.  BAS controlled the "price talk" for BA ARS auctions.  If investors placed bids well above the price talk, however, BAS was able to and did place sufficient bids to clear the auctions at lower interest rates.

80.     As a result of insufficient investor participation in the auctions, BAS was able to and did assert control over the clearing rates and the success or failure of the auctions.

81.     As an auction dealer, BAS exercised near complete control over information associated with auctions.  BAS knew the number of bidders at an auction, the individual and aggregate dollar amount of bids, the range of bid prices, whether there were sufficient bids by investors for the auction to succeed, and the clearing rates in successful auctions before those rates were disclosed to the issuer and investors.  BAS also knew whether it submitted bids at an auction and whether those bids were necessary for the auction's success.

82.     As an auction dealer, BAS knew that the number of buyers for BA ARS was becoming increasingly saturated and that adverse trends in the credit markets or unfavorable news about BA ARS would result in an increase in the imbalance between sellers and buyers of BA ARS.  Because of this

imbalance, BAS knew that its auctions would have failed without its intervention and other manipulative acts.

83.     BAS took advantage of the opportunity to manipulate the auctions for BA ARS and ensured that investors lacked sufficient information to determine that those auctions cleared only because of BAS's interventions.

### iii.     BAS Knew That BA ARS Lacked Sufficient Maximum Rates To Ensure Liquidity In The Event Of A Failed Auction

84.     BAS knew that retail investors would purchase BA ARS only if those securities were highly rated by credit ratings agencies such as Fitch Ratings, Moody's Investor Service, and Standard & Poor's.

85.     As an underwriter, BAS understood that it could obtain AAA ratings for the auction rate securities they underwrote only if those securities carried low maximum rates, as the higher the rate, the riskier the securities would be deemed to be by the agencies.  In general, BAS served as an auction dealer for the auction rate securities that it underwrote.

86.     During the Class Period, BAS underwrote billions of dollars in auction rate securities with maximum rates that were insufficient to ensure the liquidity of those securities in the event of a failed auction.

87.     Although BAS obtained AAA ratings to provide the appearance of quality and safety of principal, it knew that those ratings actually reflected the limited liquidity of BA ARS in the form of low maximum rates.

### iv.     BAS And BAIS Knew That The Market For BA ARS Was Unsustainable

88.     When BAS intervened to support an otherwise failing auction, it increased the amount of BA ARS in its proprietary account.  As a result of its frequent interventions and consequent increases in its BA ARS holdings, it was under consistent pressure to reduce its inventory of BA ARS.

89.     To reduce this increasing inventory of BA ARS in 2007 and 2008, BAS and BAIS pressured their brokers and distributing firms to sell these securities.

90.     While some auctions failed between August 2007 and early February 2008, these failed auctions represented a small fraction of the entire auction rate securities market.  These failures were not widely known to the market or investors in auction rate securities.

91.     During that time, BAS and BAIS engaged in an aggressive campaign to increase sales of BAS's own inventory of BA ARS to Class members by describing the securities as safe, highly liquid, cash-equivalent investments, without adequately disclosing the risks associated with those securities, the fact that auction dealers had allowed dozens of auctions to fail, and the likelihood that BAS would abandon the auction market, leaving investors with illiquid securities.

92.     BAS and BAIS knew that the auction rate securities market was unsustainable.  In a December 17, 2007 presentation to the State of California, a substantial issuer of municipal auction rate securities, Defendants warned that "There Has Been a Significant Dislocation in the Auction Rate Securities Market."  According to the presentation, the auction rate securities market experienced "significant year-end selling primarily by corporations" at the same time that auction dealers including BAS were faced with weaker demand for those securities by retail investors.  As a result, auction dealers including BAS were "in a defensive position facing capital constraints with ARS inventories much higher" than in 2006.  As explained in the presentation, Bank of America anticipated "[s]ignificant uncertainty related to pricing for the remainder of this year as well as next year," and concluded that "[i]t is not clear whether investor demand will return in the size required to achieve previous pricing levels."

93.     In light of the "dislocation" in the auction rate securities market, BAS sought to restructure its issuer clients' debt out of BA ARS and into financial instruments with put features or other liquidity backstops such as variable rate debt bonds ("VRDBs").  Restructuring into VRDBs would have alleviated pressure from BAS to serve as the buyer of last resort for BA ARS and enabled BAS to reduce its own exposure to those securities.

94.     Although Defendants disclosed their concerns about the auction rate securities market to their issuer clients, they did not make similar disclosures to their investor clients.

Case No. CV-08-2599 (JSW)
SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

95.     Instead, BAS and BAIS continued to encourage their brokers and distributing firms to sell BA ARS through the first half of February 2008, despite increasing turmoil in the auction rate securities market, including failures of auctions conducted by Lehman Brothers, Piper Jaffray, Stifel Nicolaus, and Goldman Sachs during the last week of January 2008 and the first week of February 2008.

96.     Not only did BAS and BAIS ramp up their efforts to sell auction rate securities, including BA ARS, to investors when they knew the auction rate securities market was unsustainable, but they also expected to and did benefit from the anticipated collapse of the market by:  (1) restructuring certain BA ARS that had high maximum rates and reaping substantial underwriting fees from the issuers of those securities; and (2) offering to make margin loans to its investor clients using their auction rate securities as collateral—in effect, loaning Class members back their own money at a profit.

**v.      That BAS Acted In Concert With Other Auction Dealers To Prop Up The Market Demonstrates Its Intent To Manipulate Or Deceive**

97.     BAS knew that the continued viability of the entire auction rate securities market depended upon its own conduct as well as that of the other auction dealers.  BAS and other auction dealers knew that if one auction dealer permitted widespread auction failures, a "run on the bank" would ensue, with panic selling by investors, and the auctions dealers being forced to choose between (a) attempting to sustain the auction rate securities market by buying all securities offered at auction and (b) allowing the auctions to fail *en masse*.

98.     As a result, BAS and other auction dealers had a common interest in suppressing auction failures.  In furtherance of their common interests, and with a tacit or express understanding that other auction dealers would similarly act to suppress auction failures, BAS continued to intervene to prevent auction failures even after the ultimate demise of the auction rate market was widely anticipated by decision-makers at BAS; BAS monitored the actions of its competitors to determine if other auction dealers appeared likely to withdraw their support for the auctions; and BAS communicated directly with competitors in an attempt to determine the time and circumstances under which BAS's competitors were likely to withdraw their support for the market.

Case No. CV-08-2599 (JSW)
SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

**D.    Plaintiffs And Class Members Relied On An Assumption That BA ARS Traded In An Efficient Market Free Of Manipulation**

99.    Plaintiffs and Class members reasonably assumed that BA ARS traded in an efficient market free of manipulation by BAS.

100.    Throughout the Class Period, BA ARS were widely held among numerous classes of investors including individuals, small businesses, charities, and large corporate and institutional holders.

101.    The very designation of BA ARS as "auction rate" securities implied that the securities were traded on an arm's-length basis, with the auctions matching buyers with sellers and establishing a clearing rate for periodic interest or dividend payments.

102.    Auction rate securities and the auction market had existed since 1984, and had developed rapidly since that time.

103.    Throughout the Class Period and continuing until just days before the collapse of the auction rate securities market, BAS and other auction dealers published research reports and presentations that touted the longevity and durability of auction rate securities.

104.    Throughout the Class Period, BAS, BAIS, and other financial firms sold auction rate securities as cash or money market equivalents without disclosing that the market for those securities was manipulated on a systematic and pervasive basis.

105.    Through these and similar statements and sales practices made or followed until the collapse of the auction rate securities market, BAS and BAIS encouraged investors to believe that sufficient market demand existed to purchase the outstanding supply of BA ARS without intervention from BAS itself, that the market for BA ARS was free of manipulation, and that any disclosures made by BAS concerning its support for BA ARS provided no basis for questioning the integrity or the fairness of the market for BA ARS.

106.    Material news concerning auction rate securities, including BA ARS, had a prompt and immediate effect on the market price of those securities, as evidenced by, among other things, the rapid decline in the market price of those securities immediately following the collapse of the auction market in February 2008.

1

2

### E.    Plaintiffs And Class Members Suffered Damages

3      107.    Plaintiffs and Class members purchased auction rate securities, including BA ARS,

4  during the Class Period.  The auction rate securities that Plaintiff Hamm purchased from BAS during the

5  Class Period, and the BA ARS that Plaintiffs Hamm and O'Gara purchased during the Class Period are

6  identified in their certifications submitted herewith.  As to each of the BA ARS purchased by Plaintiffs

7  and Class members, BAS served as the sole auction dealer, lead auction dealer, co-lead auction dealer,

8  or joint lead auction dealer.  In such capacity and with respect to each such BA ARS purchased by

9  Plaintiffs and Class members, BAS engaged in the manipulative or deceptive devices, contrivances,

10  schemes and artifices to defraud alleged herein, including, but not limited to, BAS's interventions in

11  auctions for the BA ARS purchased by Plaintiffs and Class members for the purpose and with the effect

12  of masking the true value of such BA ARS, preventing auction failures, setting the rates of interest or

13  dividends paid on BA ARS, and depriving Plaintiffs and Class members of the information necessary to

14  assess the risk characteristics of auction rate securities, including BA ARS.  By its actions, BAS directly

15  and proximately caused Plaintiffs' and Class members' injuries.

16      108.    Subsequent to the collapse of the auction rate securities market, Plaintiffs and Class

17  members have been unable to sell at par the auction rate securities, including BA ARS, they purchased

18  during the Class Period.

19      109.    Although federal and state securities regulators have forced BAS and BAIS to repurchase

20  at par value auction rate securities that they sold to some of their investor clients, Plaintiffs and Class

21  members continue to hold illiquid auction rate securities, including BA ARS.  These securities are not

22  worth the price paid for them.

23      110.    In its quarterly report to the SEC on Form 10-Q for the quarter ended March 31, 2009,

24  BAC stated that as of March 31, 2008, "we held within trading account assets approximately $2.8 billion

25  in ARS . . . ," and that "[d]uring the three months ended March 31, 2008, we recorded losses of $216

26  million on the ARS, primarily related to student loan-backed securities.  We no longer serve in our role

27  as lead manager for these securities."  BAC's recording of these losses constitutes a recognition that the

28

Case No. CV-08-2599 (JSW)

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

auction rate securities, including BA ARS, purchased by Plaintiffs and Class members are worth less than par value.

111.    A recently developed secondary market values illiquid auction rate securities, including BA ARS, at steep discounts to par value.  Investors who sold their auction rate securities on this secondary market have realized substantial losses.

112.    In addition, as a result of BAS's manipulation of auctions and clearing rates for BA ARS, Plaintiffs and Class members have not received the interest or dividends that they were entitled to receive.

**F.    Regulators Settle Some Claims Against BAS And BAIS For Fraud In The Auction Rate Securities Market**

113.    Defendants have been subject to various investigations and proceedings by state and federal securities regulators and law enforcement officials for their involvement in the auction rate securities market.

114.    The SEC first investigated Defendants' manipulation of the auction rate securities market in 2004.  On May 31, 2006, the SEC filed an Order Instituting Administrative And Cease-And-Desist Proceedings, Making Findings, And Imposing Remedial Sanctions And A Cease-And-Desist Order Pursuant To Section 8A Of The Securities Act Of 1933 And Section 15(b) Of The Securities Exchange Act of 1934, against BAS and several other major auction dealers.  (*In the Matter of Bear Stearns, et al.*, Securities Act of 1933 Release No. 8684, Securities Exchange Act of 1934 Release No. 53888, Administrative Proceeding File No. 3-12310.)

115.    The SEC found that, between January 1, 2003 and June 30, 2004, BAS and other auction dealers willfully violated Section 17(a)(2) of the Securities Act of 1933 by:  intervening in auctions by bidding for their proprietary accounts or asking customers to make or change orders to prevent failed auctions, set a "market" rate, or prevent all-hold auctions; submitting or revising auction bids after the submission deadline; allocating securities among bidders in a manner other than that which was disclosed in the prospectus; providing higher rates of return than the clearing rate to certain investors based on express or tacit understandings with those investors; and providing different price talk to certain investors, placing those investors at an advantage in the auctions.  The SEC found that BAS's

1   unlawful conduct affected the clearing rate, and required BAS to cease and desist and/or to make

2   sufficient disclosures of these manipulative practices.

3       116.    In response to the SEC's May 31, 2006 Cease-And-Desist Order, BAC caused the

4   publication of a document on its website entitled, "Banc of America Securities LLC Material Auction

5   Practices And Procedures," that described some, but not all, of the risks associated with auction rate

6   securities, including BA ARS.

7       117.    Defendants also included a vague reference to the website on the trade confirmations they

8   sent to their investor clients after they purchased auction rate securities.  As a result, Defendants' clients

9   would view an (incomplete) description of BAS's auction rate securities practices and procedures only if

10  they visited BAC's website after purchasing auction rate securities and saw and clicked on the

11  appropriate link.  Defendants failed to disclose BAC's auction rate securities practices and procedures at

12  all to investors who purchased BA ARS from distributing firms.

13      118.    This disclosure was incomplete and misleading in that it failed to disclose, among other

14  things, that the degree of intervention BAS needed to prevent the BA ARS resale market from

15  collapsing was far greater than the sporadic interventions hinted at in the disclosure; that the market for

16  BA ARS was under increasing stress brought on by the deteriorating credit environment; that the level

17  of support BAS needed to provide in order to prevent auction failures was increasing as its balance sheet

18  was weakening (thereby increasing the likelihood that BAS would withdraw their support for the

19  auctions and the securities would become illiquid); that BAS anticipated further weakening of demand

20  for BA ARS and held an increasingly negative assessment of the continued viability of the auction rate

21  securities market; and that the suppression of material facts relating to BAS's intervention in auctions

22  resulted in the rates of interest paid on BA ARS being inadequate to compensate investors for the risk of

23  illiquidity or to attract liquidity in the event of failed auctions.

24      119.    Following the collapse of the auction rate securities market in February 2008, and

25  contemporaneous with the filing of this and similar lawsuits against Defendants and other financial

26  firms, state and federal regulators commenced new investigations into securities fraud and related claims

27  by auction dealers and sellers of auction rate securities including BAS and BAIS.

28

Case No. CV-08-2599 (JSW)
SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

120.    As described in a press release issued on October 8, 2008 by the SEC, entitled, "Bank of America Agrees in Principle to ARS Settlement," the SEC's investigation involved allegations "that Bank of America made misrepresentations to thousands of its customers when it told them that ARS were safe and highly liquid cash and money market alternative investments."  According to the press release, the SEC contended that the promised liquidity "was premised on Bank of America providing support bids for auctions when there was not enough customer demand, and Bank of America did not adequately disclose this support to customers.  Bank of America continued to market ARS as cash and money market alternatives despite its awareness of the escalating liquidity risks in the weeks and months preceding the collapse of the ARS market."

121.    On September 18, 2008, Linda Chatman Thomsen, the SEC's Director of the Division of Enforcement, testified before Congress that "broker-dealer firms that underwrote, marketed and sold auction rate securities (ARS) misled their customers."  Thomsen continued:

> Through their sales forces, marketing materials, and account statements, firms misrepresented to their customers that ARS were safe, highly liquid investments that were equivalent to cash or money market funds.  As a result, numerous customers invested in ARS their savings and other funds they needed to have available on a short-term basis.  These firms failed to disclose the increasing risks associated with ARS, including their reduced ability to support the auctions.  By engaging in this conduct, ***those firms violated the Federal securities laws, including the broker-dealer antifraud provisions***.  [Emphasis added.]

122.    Implicit in the SEC's determination is that Defendants' previous disclosures to their investor clients concerning their auction rate securities practices and procedures, including those published on BAC's website beginning in 2006, were inadequate and do not insulate Defendants from liability.

123.    On October 8, 2008, the SEC announced that Defendants had agreed to a settlement in principle with federal and state regulators that permanently enjoins BAS and BAIS "from violating the provisions of Section 15(c) of the Securities Exchange Act of 1934, and Rule 15c1-2 thereunder, which prohibit the use of manipulative or deceptive devices by broker-dealers."

124.    The proposed regulatory settlement involves the repurchase of auction rate securities only from retail investors who bought the securities directly from BAS and BAIS.  The proposed regulatory

settlement fails to provide relief to other investors who were harmed by BAS's manipulation of the auction rate securities market, including investors who purchased BA ARS from distributing firms, and institutional and large business investors who purchased auction rate securities, including BA ARS, directly from BAS or BAIS.  These Class members either continue to hold illiquid BA ARS, or have sold those securities at a loss.

125.    In addition, the proposed regulatory settlement fails to compensate Class members for damages caused by the undisclosed risk of illiquidity they incurred in purchasing auction rate securities and by BAS's manipulation of interest and dividend rates for BA ARS.  The proposed regulatory settlement also fails to account for damages caused to Class members who held auction rate securities at interest rates well below market rates, following the collapse of the market.

## NO SAFE HARBOR

126.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint.

127.    The statements pleaded herein were not identified as "forward-looking statements" when made.

128.    To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

129.    Alternatively, to the extent that the statutory safe harbor applies to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by a director or an executive officer of Defendants who knew that those statements were false when made.

## LOSS CAUSATION/ECONOMIC LOSS

130.    As alleged above, during the Class Period, Defendants engaged in a comprehensive scheme and course of conduct to create, prop up, perpetuate and manipulate for their own benefit an

artificial market for auction rate securities including BA ARS, to inflate the perceived value of BA ARS, and to generate underwriting fees and auction management fees to the detriment of Class members.

131.   This comprehensive scheme and course of conduct operated as a fraud or deceit on Class members by, among other things, sending a false pricing signal to the market for BA ARS; creating a false impression of the supply and demand for BA ARS for the purpose of overvaluing the price of, and manipulating the interest rates for, those securities; and omitting to disclose material foreseeable risks concerning the market for auction rate securities, including BA ARS, and the value, safety, and liquidity risks of those investments.

132.   The materialization of the risks concealed by Defendants was foreseeable to Defendants throughout the Class Period.

133.   Those risks materialized when BAS and other auction dealers refused to continue serving as buyers of last resort for auction rate securities, including BA ARS, and the auction rate securities market collapsed.

134.   Materialization of those risks and subsequent disclosures of those risks directly and/or proximately caused the damages sustained by Plaintiffs and Class members.

135.   Only through the persistent conduct of BAS and other auction dealers in artificially supporting, maintaining, and intervening in the auctions, acting as buyers of last resort, and rigging the clearing rates was the market for auction rate securities, including BA ARS, able to exist during the Class Period.

136.   The auction rate securities market depended on the voluntary, pervasive, and ongoing participation of BAS and other auction dealers in the auctions, their manipulation of interest and dividend rates, and their acquisition of auction rate securities to keep the auctions from failing.  The conduct of BAS and other auction dealers created an illusory market that, unbeknownst to Plaintiffs and Class members, had a high risk of failing and leaving investors with illiquid BA ARS.

137.   During the Class Period, Defendants' senior management recognized that BAS's ongoing manipulation of the auction process for BA ARS, through the submission of purchase bids designed to prevent failed auctions or set clearing rates, created excessive risk to Defendants in the form of an ever-

increasing inventory of BA ARS.  As a result, BAS, BAIS, and distributing firms systematically sold down the inventory of BA ARS through an aggressive marketing campaign targeted at unsuspecting Class members.

138.    Defendants failed to disclose the purpose, nature, and effect of their manipulative conduct to Plaintiffs and Class members and the investing public generally.

139.    It was materially deceptive for Defendants to signal to investors that auction rate securities, including BA ARS, traded and were priced based on the natural interplay of supply and demand, and to represent to investors that auction rate securities, including BA ARS, were cash equivalents or highly liquid investments.

140.    When the auctions failed, the concealed risks that auction rate securities, including BA ARS, would not trade or be priced based on the natural interplay of supply and demand, and would stop trading as cash equivalents, materialized.

141.    Because of Defendants' manipulation of the market for BA ARS and their failure to disclose the material risks described herein, Plaintiffs and Class members were damaged when BAS and other auction dealers withdrew their support for the auction market.

142.    If not for Defendants' manipulation of the market for BA ARS, and their omissions and false and misleading statements of material fact about auction rate securities, including BA ARS, BAS's role in the auctions and the auction market in which those securities were traded, and the conflicts of interest between Defendants' brokerage and investment banking operations with respect to BA ARS, Plaintiffs and Class members would not have purchased auction rate securities, including BA ARS, or would not have purchased them for the prices and/or at the interest rates at which they did.

143.    Among other things, Defendants' comprehensive, manipulative, and deceptive conduct caused the interest and dividend rates on auction rate securities both before and after the collapse of the auction market to be considerably lower than the rates that the market would have placed on them had the investing public been aware of the true characteristics and risks of auction rate securities, including BA ARS, and the auction market.

144.     Accordingly, Defendants' wrongdoing directly or proximately caused economic losses to Class members by limiting the interest and dividends that they would have received in the absence of BAS's manipulation.  Class members who continue to hold their auction rate securities, including BA ARS, continue to receive interest and/or dividends on those securities at below-market rates that are insufficient to compensate for the lack of liquidity safeguards inherent in the securities.

145.     As a result of the materialization of the concealed risk that Defendants were manipulating the auction rate securities market, the true value and liquidity characteristics of auction rate securities, including BA ARS, have been revealed.  Auction rate securities remain illiquid and cannot be sold at par value on the open market.  A recently developed secondary market values illiquid auction rate securities at steep discounts to par value.  Investors who have sold their auction rate securities, including BA ARS, on this secondary market have realized substantial losses.

### COUNT I

**Violation Of Section 10(b) Of The Exchange Act
And Rule 10b-5(a) And (c) Promulgated Thereunder
Against BAS By Plaintiffs Hamm And O'Gara And The Class**

146.     Plaintiffs repeat and reallege each and every allegation set forth in the paragraphs above as if fully set forth herein.  Plaintiffs bring this cause of action on behalf of themselves and the Class against Defendant BAS under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5(a) and (c) promulgated thereunder, 17 C.F.R. 240.10b-5(a), (c).

147.     During the Class Period, BAS knew or recklessly disregarded that:  sellers and supply of BA ARS outstripped buyers and demand for BA ARS; that this imbalance in supply and demand for BA ARS would lead to auction failures; and that to avoid auction failures, BAS needed to intervene to create and perpetuate the illusion of a balanced and functioning market for BA ARS.

148.     During the Class Period, BAS employed manipulative or deceptive devices or contrivances, in contravention of Rule 10b-5(a) and (c) promulgated by the SEC, which were intended to and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiffs and Class members; (ii) enable BAS to underwrite and serve as an auction dealer for billions of dollars of BA ARS, and on which BAS made substantial underwriting and auction dealer fees; (iii) enable BAS to

sustain an artificial market for BA ARS, conceal failures of auctions for BA ARS, and conceal imbalances in the market for BA ARS; (iv) enable BAS to manipulate the interest rates for BA ARS; and (v) cause Plaintiffs and Class members to purchase overvalued BA ARS.

149.    BAS employed devices, schemes, and artifices to defraud, and engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of BA ARS, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c).

150.    BAS, directly and indirectly, individually and in concert, engaged and participated in a comprehensive scheme and continuous course of conduct to manipulate the market for BA ARS and to defraud purchasers of those securities, as specified herein.

151.    BAS employed manipulative or deceptive devices or contrivances, schemes and artifices to defraud, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to deceive Plaintiffs and Class members as to the value of BA ARS by, among other things, misleading Plaintiffs and Class members to believe that the prices at which they purchased BA ARS were determined by the natural interplay of supply and demand, and were not set by BAS.

152.    BAS's manipulative conduct was furthered by the use, means, or instrumentalities of interstate commerce and/or the mails, including but not limited to use of the wires by BAS and its personnel to plan and transmit instructions for the manipulation of auctions for BA ARS; and transmitting to its brokers, distributing firms, and investor clients research reports, presentations, and other materials concerning BA ARS.

153.    BAS had actual knowledge of the devices, schemes, and artifices to defraud and acts, practices, and course of business which operated as a fraud and deceit upon the purchasers of BA ARS, as set forth herein, or acted with deliberate disregard of the fraudulent or deceitful nature of said conduct.

154.    BAS employed the devices, schemes, and artifices to defraud and engaged in the acts, practices, and course of business described herein, knowingly or deliberately and for the purpose and effect of (a) manipulating the market for BA ARS, (b) concealing the truth about the value, liquidity,

and risks of BA ARS from Plaintiffs, Class members, and the investing public, and (c) supporting the inflated prices and market for BA ARS.

155.    If BAS did not have actual knowledge of the devices, schemes, and artifices to defraud and acts, practices, and course of business which operated as a fraud and deceit on the purchasers of BA ARS, it was deliberately reckless in failing to obtain such knowledge by refraining from taking those steps necessary to discover the manipulative purpose, nature, and effect of their conduct.

156.    As a result of BAS's devices, schemes, and artifices to defraud and acts, practices, and course of business, the market prices of BA ARS failed to reflect a fair or just price of those securities and were artificially inflated during the Class Period.

157.    In ignorance of the fact that the market prices of BA ARS were artificially inflated, and relying directly or indirectly on an assumption of an efficient market for BA ARS free of manipulation by BAS, Plaintiffs and Class members acquired overvalued BA ARS that were manipulated by BAS during the Class Period, and were damaged thereby.

158.    At the time BAS employed the devices, schemes, and artifices to defraud and engaged in the acts, practices, and course of business described herein, Plaintiffs and Class members were ignorant of BAS's conduct, and believed BA ARS traded in an efficient market free of manipulation, at prices and with yields set by free-market influences.

159.    Had Plaintiffs, Class members, and the marketplace known the truth regarding the value, liquidity, and risks of BA ARS, including the extent to which the market for BA ARS was sustained by BAS and not determined by the natural interplay of supply and demand, Plaintiffs and Class members would not have purchased BA ARS at all or would not have done so at the prices they paid.

160.    By virtue of the foregoing, BAS has violated Section 10(b) of the Exchange Act, and Rule 10b-5(a) and (c) promulgated thereunder.

161.    As a direct and proximate result of BAS's wrongful conduct, Plaintiffs and Class members suffered damages in connection with their purchases of BA ARS during the Class Period.

# COUNT II

### Violation Of Section 20(a) Of The Exchange Act
### Against BAC By Plaintiffs Hamm And O'Gara And The Class

162.    Plaintiffs repeat and reallege each and every allegation set forth in the paragraphs above as if fully set forth herein.  Plaintiffs bring this cause of action on behalf of themselves and the Class against BAC.

163.    BAC acted as a controlling person of BAS within the meaning of Section 20(a) of the Exchange Act for the reasons alleged in this Complaint.

164.    By virtue of its ownership of BAS, operational and management control of BAS's business, and systematic involvement in the fraudulent scheme alleged in this Complaint, BAC had the power to influence and control and did influence and control, directly or indirectly, the decision-making and actions of BAS, including the devices, schemes and artifices to defraud, and the acts, practices, and course of business, described herein which Plaintiffs contend manipulated the market for BA ARS.

165.    BAC had the ability to prevent the employment of the devices, schemes and artifices to defraud, and the engagement in the acts, practices and course of business, described in this Complaint.

166.    BAC had direct and supervisory involvement in the operations of BAS, and therefore, is presumed to have had and exercised the power to control or influence the particular conduct giving rise to the securities violations alleged in this Complaint.

167.    As set forth above, BAS violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder by its acts and omissions as alleged in this Complaint.

168.    By virtue of its positions as a controlling person, BAC is liable for those violations pursuant to Section 20(a) of the Exchange Act.

169.    As a direct and proximate result of BAC's wrongful conduct, Plaintiffs and Class members suffered damages in connection with their respective purchases of BA ARS during the Class Period.

## COUNT III

**Violation Of Section 10(b) Of The Exchange Act
And Rule 10b-5(b) Promulgated Thereunder
Against BAS And BAIS By Plaintiff Hamm And The Class**

170.    Plaintiff Hamm repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein.  Plaintiff Hamm brings this cause of action on behalf of itself and the Class against BAS and BAIS (collectively, "the Selling Defendants")

171.    Plaintiff Hamm retains significant cash reserves at Bank of America to fund employee retirement accounts.  Because its cash reserves are for employee retirement funds, Hamm limits the investment of its cash reserves in highly rated liquid investment securities.  Bank of America was aware of Hamm's investment practices, and those practices have not changed or deviated during Hamm's relationship with Bank of America.

172.    C. Scott Anderson authorized Hamm's purchases of auction rate securities, including BA ARS, from BAS.  Hamm's primary contacts at BAS were Jason Glidden and Olen Dobkins.  Mr. Glidden contacted Mr. Anderson in January 2006 and advised him to purchase auction rate securities, which Mr. Glidden described as being cash equivalent instruments that were an alternative to money market funds.  Mr. Glidden stated that no auctions had ever failed and that auction rate securities were safe.

173.    Based on Mr. Anderson's communications with Mr. Glidden and Mr. Dobkins, Hamm purchased auction rate securities in February 2006, and made subsequent purchases of auction rate securities thereafter.  Mr. Anderson communicated with Mr. Glidden or Mr. Dobkins before each of Hamm's subsequent auction rate securities purchases.  Mr. Anderson relied on Mr. Glidden and Mr. Dobkins to select the particular auction rate securities, including BA ARS, to be purchased for Hamm's account.

174.    In August 2007, Hamm requested that BAS review Hamm's securities holdings and advise whether Hamm needed to alter any of its holdings due to the credit related crisis and problems in the capital markets.  Mr. Glidden and Mr. Dobkins undertook this review, assured Hamm that its

securities would not be affected by the credit crisis or problems in the capital markets, and did not advise Hamm to alter its holdings.

175.    Mr. Glidden and Mr. Dobkins assured Mr. Anderson that auction rate securities were low-risk investments, that the investments could be liquidated every 7 to 28 days, making them cash equivalents, and that they had virtually no default or liquidity risk.

176.    Neither Mr. Glidden, Mr. Dobkins, nor any other Bank of America employee provided Mr. Anderson with a prospectus for auction rate securities, a written description of BAS's auction rate securities practices and procedures, or any written materials concerning auction rate securities before, after, or at the time of sale.  Neither Mr. Glidden, Mr. Dobkins, nor any other Bank of America employee explained to Mr. Anderson how auction rate securities, including BA ARS were traded or priced, that Hamm could seek to influence interest rates by bidding in the auctions, or the extent to which BAS supported the auction market.

177.    Niether Mr. Glidden, Mr. Dobkins, nor any other Bank of America employee informed Mr. Anderson of the information in paragraphs 59-61 before Hamm purchased auction rate securities from BAS.  Had Mr. Anderson known about the information in paragraphs 59-61, Hamm would not have purchased auction rate securities, including BA ARS, or would not have done so at the prices it paid.

178.    During the Class Period, the Selling Defendants employed manipulative or deceptive devices or contrivances, in contravention of Rule 10b-5(b) promulgated by the SEC, which were intended to and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff Hamm and Class members; (ii) enable the Selling Defendants to sell billions of dollars of auction rate securities, including BA ARS, directly to investors, and on which BAS made substantial underwriting fees, auction management fees, and sales commissions; (iii) enable BAS to sustain an artificial market and conceal failures of auctions for auction rate securities, including BA ARS; (iv) enable BAS to manipulate the interest rates for BA ARS; and (v) cause Plaintiff Hamm and Class members to purchase overvalued auction rate securities, including BA ARS, directly from the Selling Defendants.

Case No. CV-08-2599 (JSW)
SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

179.     The Selling Defendants, jointly and individually (and each of them), engaged in a scheme to defraud and made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b).

180.     The Selling Defendants, individually and in concert, directly and indirectly, engaged and participated in a comprehensive scheme to defraud and a continuous course of conduct to conceal adverse material information about auction rate securities, including BA ARS, sold directly by the Selling Defendants, as specified herein, including in particular the information specified in paragraphs 59-61 above.

181.     The information that the Selling Defendants failed to disclose to Plaintiff Hamm and Class members was material in that there is a substantial likelihood that the disclosure of the omitted information would have been viewed by a reasonable investor as having significantly altered the total mix of information about auction rate securities, including BA ARS, made available.

182.     The Selling Defendants' fraudulent scheme was furthered by the use, means, or instrumentalities of interstate commerce and/or the mails, including but not limited to transmitting to its brokers, distributing firms, and investor clients account statements, research reports, presentations, and other materials concerning auction rate securities.

183.     The Selling Defendants employed manipulative or deceptive devices or contrivances, while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure Plaintiff Hamm and Class members that auction rate securities, including BA ARS, sold directly by the Selling Defendants were the same as cash and were highly liquid, safe short-term investment vehicles suitable for almost all investors.

184.     The Selling Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with deliberate disregard for the truth in that they failed to ascertain and to disclose such facts.

185.     The Selling Defendants made the material misrepresentations and/or omissions described herein knowingly or deliberately and for the purpose and effect of (a) concealing from Plaintiff Hamm,

Class members, and the investing public the truth about the value, liquidity, and risks of auction rate securities, including BA ARS, sold by the Selling Defendants, and (b) supporting the inflated price and market for auction rate securities, including BA ARS.

186.    If the Selling Defendants did not have actual knowledge of the misrepresentations and omissions alleged herein, they were deliberately reckless in not obtaining such knowledge and refraining from taking those steps necessary to discover whether those statements were false or misleading.

187.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of auction rate securities, including BA ARS, sold by the Selling Defendants was artificially inflated during the Class Period.

188.    To the extent required, a presumption of reliance is applicable here due to the Selling Defendants' use of standardized sales pitches, which omitted on a uniform basis the material facts described in paragraphs 59-61 regarding auction rate securities, BAS's role in the auctions and the auction market in which those securities were traded, and the conflicts of interest between the Selling Defendants' brokerage and investment banking operations with respect to BA ARS.

189.    The facts described in paragraphs 59-61, which the Selling Defendants failed to disclose, were material in that there is a substantial likelihood that the disclosure of these facts would have been viewed by a reasonable investor as having significantly altered the total mix of information about auction rate securities, including BA ARS, made available.

190.    The Selling Defendants' brokers were required to and did use uniform, standardized, and materially identical sales pitches created and/or approved by the Selling Defendants' senior management to market and sell auction rate securities, including BA ARS, to Plaintiff Hamm and Class members.

191.    In light of the Selling Defendants' knowledge that their sales force routinely represented to investors that auction rate securities, including BA ARS, were safe, highly liquid investments with interest rates established by periodic auctions, it was materially misleading for the Selling Defendants to fail to correct the record and state expressly that those securities were, among other things, neither safe nor liquid investments and/or had interest rates managed by BAS.

192.    Plaintiff Hamm and Class members would not have invested in auction rate securities, including BA ARS, or alternatively, would not have purchased those securities on the terms at which they did, had the Selling Defendants' omissions of material fact not concealed the true nature of those securities, BAS's role in the auctions and the auction market in which those securities were traded, and the conflicts of interest between the Selling Defendants' brokerage and investment banking operations with respect to BA ARS.

193.    Plaintiff Hamm's and Class members' fraud-based claims stem primarily, if not exclusively, from these omissions of material fact for which reliance may be presumed.

194.    In the alternative, and to the extent required, a presumption of reliance is applicable here because the Selling Defendants' comprehensive scheme to defraud created the market for BA ARS, as alleged in this Complaint.

195.    In purchasing auction rate securities, including BA ARS, Plaintiff Hamm and Class members relied on the integrity of the market, i.e., on the availability of auction rate securities on the market, including BA ARS, as an indication that those securities were genuine and entitled to be marketed.

196.    As described in this Complaint, however, the Selling Defendants' fraudulent scheme was so pervasive that it created an illusory auction market without which auction rate securities, including BA ARS, would not have existed or traded.

197.    The extent to which the Selling Defendants' fraudulent scheme created and sustained the market for auction rate securities, including BA ARS, became apparent when BAS refused to continue supporting the auction market.  BAS's withdrawal of "support" for the auctions caused the auction market to fail and auction rate securities, including BA ARS, to become illiquid.

198.    During the Class Period, BAS underwrote BA ARS knowing that those securities would not clear either upon, or shortly after, issuance without BAS's intervention.  As a result, those securities were neither legally qualified to be issued nor capable of fulfilling a public purpose.

199.    But for the fraudulent scheme by which BAS artificially supported, maintained, and intervened in the auctions throughout the Class Period, the market for auction rate securities, including BA ARS, would have failed, and auction rate securities would not have been marketable at any price.

200.    Plaintiff Hamm and Class members would not have invested in auction rate securities, including BA ARS, or alternatively, would not have purchased those securities on the terms at which they did, had the Selling Defendants' comprehensive scheme to defraud not created the market for those securities.

201.    In ignorance of the fact that the market prices of auction rate securities, including BA ARS, sold directly by the Selling Defendants were artificially inflated, and relying directly or indirectly on the false and misleading statements or omissions of material fact made by the Selling Defendants, and/or on the absence of material information that was known to or deliberately disregarded by the Selling Defendants but not disclosed in public statements by the Selling Defendants during the Class Period, and/or on the apparent integrity of the auction market in which auction rate securities, including BA ARS, traded, Plaintiff Hamm and Class members acquired overvalued auction rate securities, including BA ARS, sold by the Selling Defendants during the Class Period and were damaged thereby.

202.    At the time of said misrepresentations and omissions, Plaintiff Hamm and Class members were ignorant of their falsity, and believed them to be true.

203.    Plaintiff Hamm and Class members acted with due diligence, did not act with recklessness, and could not have discovered the true facts that the Selling Defendants misstated and/or failed to disclose.

204.    Had Plaintiff Hamm, Class members, and the marketplace known the truth regarding the value, liquidity, and risks of auction rate securities, including BA ARS, sold by the Selling Defendants, which were not disclosed by the Selling Defendants, they would not have purchased those securities from the Selling Defendants, or, if they had acquired such securities during the Class Period, they would not have done so at the inflated prices they paid.

205.    By virtue of the foregoing, the Selling Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5(b) promulgated thereunder.

206.     As a direct and proximate result of the Selling Defendants' wrongful conduct, Plaintiff Hamm and Class members suffered damages in connection with their respective purchases of auction rate securities, including BA ARS, from the Selling Defendants during the Class Period.

## COUNT IV

### Violation Of Section 20(a) Of The Exchange Act
### Against BAC And BAS By Plaintiff Hamm And The Class

207.     Plaintiff Hamm repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein.  Plaintiff Hamm brings this cause of action on behalf of itself and the Class against BAC and BAS (the "Control Person Defendants").

208.     Each of the Control Person Defendants acted as a controlling person of BAS and/or BAIS within the meaning of Section 20(a) of the Exchange Act for the reasons alleged in this Complaint.

209.     By virtue of their ownership, and/or operational and management control of BAS's and/or BAIS's business, and their systematic involvement in the fraudulent scheme alleged in this Complaint, the Control Person Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making and actions of BAS and/or BAIS, including the content and dissemination of the various statements and omissions of material fact which Plaintiff Hamm contends are false and misleading.

210.     The Control Person Defendants had the ability to prevent the issuance of the statements and omissions of material facts described in this Complaint.

211.     Each of the Control Person Defendants had direct and supervisory involvement in the operations of BAS and/or BAIS, and therefore, is presumed to have had and exercised the power to control or influence the particular conduct giving rise to the securities violations alleged in this Complaint.

212.     As set forth above BAS and BAIS violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder by their acts and omissions as alleged in this Complaint.

213.     By virtue of their positions as controlling persons, the Control Person Defendants are liable for those violations pursuant to Section 20(a) of the Exchange Act.

214.    As a direct and proximate result of the Control Person Defendants' wrongful conduct, Plaintiff Hamm and Class members suffered damages in connection with their respective purchases of auction rate securities, including BA ARS, from the Selling Defendants during the Class Period.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action, certifying Plaintiffs as representatives of the Class under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' Lead Counsel as counsel for the Class;

B.    Awarding damages, including but not limited to rescission, other compensatory damages, consequential damages, restitution and disgorgement of ill-gotten gains in favor of Plaintiffs and Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees, litigation costs, and expert fees;

D.    Awarding Plaintiffs and the Class pre-judgment and post-judgment interest;

E.    Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity, and the federal statutory provisions sued hereunder; and

F.    Granting such other and further relief as the Court may deem just and proper.

//
//
//
//
//
//
//
//

//

Case No. CV-08-2599 (JSW)
SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

1

## JURY TRIAL DEMANDED

2

Plaintiffs hereby demand a trial by jury.

3

4

Dated: May 12, 2009                    Respectfully submitted,

5

**GIRARD GIBBS LLP**

6

By:   _/s/ Aaron M. Sheanin_____

7

Aaron M. Sheanin

8

Daniel C. Girard
Jonathan K. Levine
Christina H. C. Sharp

9

601 California Street, 14th Floor
San Francisco, CA 94108

10

Telephone:  (415) 981-4800
Facsimile:  (415) 981-4846

11

**Lead Counsel for Plaintiffs and the Proposed Class**

12

13

14

**Additional Counsel for Plaintiffs:**

15

Norman E. Siegel
STUEVE SIEGEL HANSON LLP

16

460 Nichols Road, Suite 200
Kansas City, MO, 64112

17

Telephone: (816) 714-7100
Facsimile: (816) 714-7101

18

19

Christopher A. Seeger
Stephen A. Weiss
David R. Buchanan

20

SEEGER WEISS LLP
One William Street

21

New York, NY 10004
Telephone:  (212) 584-0700

22

Facsimile:  (212) 584-0799

23

Jerome M. Congress
Kent A. Bronson

24

MILBERG LLP
One Pennsylvania Plaza

25

New York, NY 10019
Telephone:  (212) 594-5300

26

Facsimile:  (212) 273-4387

27

Jeff Westerman

28

MILBERG LLP
One California Plaza

- 41 -

300 South Grand Avenue, Suite 3900
Los Angeles, CA  90071-3172
Telephone:  (213) 617-1200
Facsimile:  (213) 617-1975

George A. Shohet
LAW OFFICES OF GEORGE A. SHOHET
A Professional Corporation
245 Main Street, Suite 310
Venice, CA  90291
Telephone:  (310) 452-3176
Facsimile:  (310) 452-2270

Case No. CV-08-2599 (JSW)
SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

## CERTIFICATION OF PROPOSED LEAD PLAINTIFF
## PURSUANT TO THE FEDERAL SECURITIES LAWS

I, C. Scott Anderson, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1. I am the Chief Financial Officer of N.R. Hamm Quarry, Inc. and submit this certification on behalf of N.R. Hamm Quarry, Inc. ("Hamm").

2. I have reviewed the complaint against Bank of America, prepared by Stueve Siegel Hanson LLP and Girard Gibbs LLP and ("Counsel"), whom I designate as my counsel in this action for all purposes.

3. Hamm did not acquire any auction rate securities from Bank of America at the direction of Counsel or in order to participate in any private action under the federal securities laws.

4. Hamm is willing to serve as a lead plaintiff either individually or as part of a group. I understand that a lead plaintiff is a representative party who acts on behalf of other class members in directing the litigation, and whose duties may include testifying at deposition or trial.

5. Hamm will not accept any payment for serving as a representative party beyond Hamm's pro rata share of any recovery, except reasonable costs and expenses, such as lost wages and travel expenses, directly related to the class representation, as ordered or approved by the Court pursuant to law.

6. Hamm has not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years.

1

7.    I understand that this is not a claim form, and that my ability to share in any recovery as a class member is not affected by my decision to serve as a representative party.

8.    Hamm's purchases and sales of auction rate securities sold to Hamm through Bank of America are attached as **Attachment A** to this document:

9.    I declare under penalty of perjury that the foregoing is true and correct.

Executed this 12th day of May, 2009

N.R. Hamm Quarry, Inc.

By: _C. Scott Anderson_

C. Scott Anderson
Chief Financial Officer

2

## ATTACHMENT A

| Trade Date | Auction Rate Security | Value of Shares | Buy or Sell |
|---|---|---|---|
| 02/02/2006 | SLM Student Loan Trust 2002-7 Class A-8 CUSIP 78442GEU6 | 2,000,000 | Bought |
| *See below | SLM Student Loan Trust 2003-2 Class A-7 CUSIP 78442GFU5 | 2,100,000 | Bought |
| 04/30/2007 | Nelnet Student Loan Trust 2005-4 Class A4R2 CUSIP 64031QCM1 | 3,500,000 | Bought |
| 09/19/2007 | Mississippi Higher Ed Assistance Corp Student LN Rev Var-Taxable Asset Backed SR-A5 CUSIP 605354EW5 | 2,000,000 | Bought |
| 08/22/2007 | Panhandle-Plains Tex Higher EdAuth Inc Student LN Rev ARS-Taxable-SR-Ser A-2 CUSIP 698476DS4 | 1,000,000 | Bought |
| Called 03/27/2009 | Brazos Student FIN Corp 2004A-4 Student LN asset BKD SR NT CUSIP 10623PCX6 | 50,000 | Bought |
| 09/18/2006 | SLM Student Loan Trust 2006-7 Class A6C CUSIP 78443GAH8 | 600,000 | Bought |
| 10/06/2006 | Northstar Ed Fin Inc Del Taxable-Arcs-Asset Bkd- | 1,000,000 | Bought |

|  | Ser A-5<br>CUSIP 66704JAJ7 |  |  |
|---|---|---|---|
| 08/03/2007 | Missouri Higher Ed LN<br>Auth Student Loan Rev<br>Var-Taxable-Ser F<br>CUSIP 606072HP4 | 1,050,000 | Bought |
| 09/07/2007 | Panhandle-Plains Tex<br>Higher Edauth Inc Student<br>Ln Rev Var-Taxable-SR-<br>Ser A-4<br>CUSIP 698476EF1 | 1,975,000 | Bought |

| * | SLM 78442GFU5 | $1,000,000 | 04/21/2006 |
|---|---|---|---|
|  | SLM 78442GFU5 | $500,000 | 06/16/2006 |
|  | SLM 78442GFU5 | $600,000 | 05/22/2006 |

4

## CERTIFICATION OF PROPOSED LEAD PLAINTIFF
## PURSUANT TO THE FEDERAL SECURITIES LAWS

I, Ed O'Gara, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.      I have reviewed the amended complaint against Bank Of America Corporation, Banc Of America Investment Services, Inc., and Banc Of America Securities, LLC, (collectively "Bank of America") prepared by Girard Gibbs LLP ("Counsel"), whom I designate as my counsel in this action for all purposes.

2.      I did not acquire any auction rate securities managed by Bank of America at the direction of Counsel or in order to participate in any private action under the federal securities laws.

3.      I am willing to serve as a lead plaintiff either individually or as part of a group.  I understand that a lead plaintiff is a representative party who acts on behalf of other class members in directing the litigation, and whose duties may include testifying at deposition or trial.

4.      I will not accept any payment for serving as a representative party beyond my pro rata share of any recovery, except reasonable costs and expenses, such as lost wages and travel expenses, directly related to the class representation, as ordered or approved by the Court pursuant to law.

5.      I have sought to serve as a representative party for a class in an action under the federal securities laws within the past three years, in the matter styled *Ciplet v. JPMorgan Chase & Co. and J.P. Morgan Securities Inc.*, 08-cv-4580 (S.D.N.Y.).

///

///

6.    I understand that this is not a claim form, and that my ability to share in any recovery as a class member is not affected by my decision to serve as a representative party.

7.    My purchases and sales of auction rate securities managed by Bank of America are attached as **Attachment A** to this document.

8.    I declare under penalty of perjury that the foregoing is true and correct.

Executed this 2 day of May, 2009

_____
Ed O'Gara

**ATTACHMENT A**

**BA ARS PURCHASED BY PLAINTIFF EDWARD F. O'GARA
DURING THE CLASS PERIOD**

| TRADE DATE | AUCTION RATE SECURITY | AMOUNT | BUY OR SELL |
|---|---|---|---|
| 1/24/2008 | Brazos Higher Ed Auth Inc Student Ln 2006A-11 | $250,000 | Bought |

1
2

## CERTIFICATE OF SERVICE

3

I, Aaron M. Sheanin, hereby certify that on May 12, 2009, I caused the foregoing document to be

4

filed electronically with the United States District Court for the Northern District of California's through

5

the Court's mandated ECF service.  Counsel of record are required by the Court to be registered e-filers,

6

and as such are automatically e-served with a copy of the document(s) upon confirmation of e-filing.

7

I further certify that I caused this document to be forwarded to the following designated Internet

8
9

site at: http://securities.stanford.edu/.

10

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 12th day of

11

May, 2009 at San Francisco, California.

12
13

_____ /s/ Aaron M. Sheanin___

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28