1   DEBRA S. BELAGA (S.B. #083237)
    AARON M. ROFKAHR (S.B. #227008)
2   O'MELVENY & MYERS LLP
    Two Embarcadero Center, 28th Floor
3   San Francisco, California  94111
    Telephone:     (415) 984-8700
4   Facsimile:     (415) 984-8701
    Email:         dbelaga@omm.com
5                  arofkahr@omm.com

6   JONATHAN ROSENBERG (admitted *pro hac vice*)
    B. ANDREW BEDNARK (admitted *pro hac vice*)
7   O'MELVENY & MYERS LLP
    7 Times Square
8   New York, New York  10036
    Telephone:     (212) 326-2000
9   Facsimile:     (212) 326-2061
    Email:         jrosenberg@omm.com
10                 abednark@omm.com

11  ROBERT M. STERN (admitted *pro hac vice*)
    O'MELVENY & MYERS LLP
12  1625 Eye Street, NW
    Washington, DC  20006
13  Telephone:     (202) 383-5300
    Facsimile:     (202) 383-5414
14  Email:         rstern@omm.com

15  *Attorneys for Defendants Bank of America Corporation*
    *and Banc of America Securities LLC*
16

17              **UNITED STATES DISTRICT COURT**
               **NORTHERN DISTRICT OF CALIFORNIA**
18                 **SAN FRANCISCO DIVISION**

19  IN RE Bank of America Corp. Auction Rate          MDL No. 09-2014
    Securities Marketing Litigation:
20                                                    This Document Relates to:
    AEROFLEX INCORPORATED,
21                                                    Case No.  C09-05245 JSW
                   Plaintiff,
22                                                    **DEFENDANTS' NOTICE OF**
          v.                                          **MOTION, MOTION TO DISMISS,**
23                                                    **AND MEMORANDUM OF POINTS**
    BANK OF AMERICA CORPORATION and                   **AND AUTHORITIES**
24  BANC OF AMERICA SECURITIES LLC,
                                                      Hearing Date:  June 4, 2010
25                 Defendants.                        Time:          9:00 a.m.
                                                      Place:         Courtroom 11, 19th Floor
26                                                    Judge:         Jeffrey S. White

27

28

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii

NOTICE OF MOTION AND MOTION ............................................................................ vii

STATEMENT OF ISSUES TO BE DECIDED ................................................................ viii

SUMMARY OF ARGUMENT .......................................................................................... ix

STATEMENT OF FACTS ................................................................................................... 1

ARGUMENT ........................................................................................................................ 5

I.   THE FAC DOES NOT PLEAD FRAUD WITH THE PARTICULARITY THAT RULE 9(b) AND THE PSLRA REQUIRE ........................................................ 5

    A.   Aeroflex's "manipulative conduct" allegations are based on unparticularized misrepresentations and omissions .............................. 6

    B.   Even if the FAC had alleged manipulative conduct not based on misrepresentations or omissions, its general and conclusory allegations would violate Rule 9(b) ........................................................................... 7

    C.   BAS disclosed the conduct that Aeroflex alleges was manipulative ..................... 9

II.   THE FAC'S FACTUAL ALLEGATIONS DO NOT GIVE RISE TO A "STRONG INFERENCE" THAT BAS ACTED WITH SCIENTER ............................ 10

    A.   The FAC does not identify who allegedly defrauded Aeroflex ............................ 11

    B.   The FAC fails to particularize facts constituting strong circumstantial evidence of intentional or conscious misconduct ................................................. 12

        1.   The FAC's reference to an isolated presentation is inconclusive ............. 13

        2.   The FAC's allegations regarding regulatory settlements are insufficient ................................................................................................ 14

    C.   The FAC's allegations as a whole do not give rise to a strong scienter inference ............................................................................................................... 14

        1.   The FAC does not allege that BAS was motivated to defraud Aeroflex ................................................................................................... 15

        2.   There was no "opportunity" to commit fraud in view of abundant public disclosures and reports .................................................................. 17

        3.   The "totality of circumstances" shows that market conditions—not fraud—caused Aeroflex's ARS auctions to fail ...................................... 18

III.   BAS'S ARS-RELATED DISCLOSURES PRECLUDE AEROFLEX'S REASONABLE RELIANCE .......................................................................................... 19

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

IV.     THE FAC FAILS TO PLEAD ADEQUATELY THAT BAS'S CONDUCT
        CAUSED AEROFLEX'S ALLEGED LOSS ................................................................... 21

V.      THE SECTION 20(a) CLAIM AGAINST BAC FAILS BECAUSE THE
        PRIMARY SECTION 10(b) CLAIMS FAIL .................................................................. 23

VI.     AEROFLEX'S COMMON-LAW CLAIMS SHOULD BE DISMISSED ...................... 23

VII.    THE FAC SHOULD BE DISMISSED WITH PREJUDICE ........................................... 25

CONCLUSION ........................................................................................................................... 25

# TABLE OF AUTHORITIES

*In re Acterna Corp. Sec. Litig.*,
 378 F. Supp. 2d 561 (D. Md. 2005) ................................................................................22

*In re Apple Computer, Inc. Sec. Litig.*,
 243 F. Supp. 2d 1012 (N.D. Cal. 2002) ..........................................................................11

*ATSI Commc'ns, Inc. v. The Shaar Fund, Ltd.*,
 493 F.3d 87 (2d Cir. 2007)..........................................................................................7, 9

*Bell Atlantic Corp. v. Twombly*,
 550 U.S. 544 (2007)..................................................................................................10, 17

*Bennett v. H&R Block Fin. Advisors, Inc.*,
 No. C 04-4848, slip op. (N.D. Cal. June 1, 2005).......................................................13, 16

*Bennett v. H&R Block Fin. Advisors, Inc.*,
 No. C 04-4848, 2005 U.S. Dist. LEXIS 25273 (N.D. Cal. Oct. 27, 2005) ..........................23

*Binder v. Gillespie*,
 184 F.3d 1059 (9th Cir. 1999)............................................................................................19

*In re Citigroup Auction Rate Sec. Litig.*,
 No. 08 Civ. 3095, 2009 U.S. Dist. LEXIS 83046, (S.D.N.Y. Sept. 11, 2009) ..............*passim*

*Crossen v. Bernstein*,
 No. 91 Civ. 3501, 1994 U.S. Dist. LEXIS 8388 (S.D.N.Y. June 23, 1994) ........................24

*Defer L.P. v. Raymond James Fin., Inc.*,
 654 F. Supp. 2d 204 (S.D.N.Y. 2009)........................................................................x, 12, 16

*In re Ditech Commc'ns Corp. Sec. Litig.*,
 No. C 05-2406, 2007 U.S. Dist. LEXIS 78411 (N.D. Cal. Oct. 11, 2007)....................10, 14

*In re Doral Fin. Corp. Sec. Litig.*,
 563 F. Supp. 2d 461 (S.D.N.Y. 2008).................................................................................15

*In re Dot Hill Sys. Corp. Sec. Litig.*,
 594 F. Supp. 2d 1150 (S.D. Cal. 2008) .........................................................................16, 17

*Dura Pharms., Inc. v. Broudo*,
 544 U.S. 336 (2005).............................................................................................................21

*Foster v. Wilson*,
 504 F.3d 1046, 1051-52 (9th Cir. 2007) .............................................................................23

*Glazer Capital Mgmt., LP v. Magistri*,
 549 F.3d 736 (9th Cir. 2008)..................................................................................11, 12, 14

*Glenbrook Capital Ltd. P'ship v. Kuo*,
 No. C 07-2377, 2009 U.S. Dist. LEXIS 30745 (N.D. Cal. Mar. 30, 2009) ..............11, 22, 23

*Healthcare Fin. Group, Inc. v. Bank Leumi USA*,
 No. 08 Civ. 11260, 2009 U.S. Dist. LEXIS 101948 (S.D.N.Y. Oct. 26, 2009)...............x, 22

*Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*,
   159 F.3d 723 (2d Cir. 1998)................................................................................x, 19

*In re Int'l Rectifier Corp. Sec. Litig.*,
   No. CV 07-2544, 2008 U.S. Dist. LEXIS 44872 (C.D. Cal. May 23, 2008).......................11

*Kenney v. Deloitte, Haskins & Sells*,
   No. C 91-590, 1992 U.S. Dist. LEXIS 14600 (N.D. Cal. Sept. 1, 1992)............................19

*In re Leapfrog Enters., Inc. Sec. Litig.*,
   527 F. Supp. 2d 1033 (N.D. Cal. 2007) ...............................................................21

*Lentell v. Merrill Lynch & Co., Inc.*,
   396 F.3d 161 (2d Cir. 2005)..............................................................................6, 22

*Leykin v. AT&T Corp.*,
   423 F. Supp. 2d 229 (S.D.N.Y. 2006) .................................................................22

*Lory v. Ryan*,
   No. CV 07-2174, 2008 U.S. Dist. LEXIS 84478 (D. Ariz. Oct. 20, 2008) ........................17

*Luminent Mortgage Capital, Inc. v. Merrill Lynch & Co.*,
   No. 07-5423, 2009 U.S. Dist. LEXIS 74382 (E.D. Pa. Aug. 20, 2009) ............................23

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
   513 F.3d 702 (7th Cir. 2008)..............................................................................12

*McCasland v. Formfactor Inc.*,
   No. C 07-5545, 2008 U.S. Dist. LEXIS 60544 (N.D. Cal. July 25, 2008) ........................11

*McCasland v. Formfactor Inc.*,
   No. C 07-5545, 2009 U.S. Dist. LEXIS 59996 (N.D. Cal. July 14, 2009) ....................15, 25

*In re Medicis Pharm. Corp. Sec. Litig.*,
   No. CV-08-1821, 2009 U.S. Dist. LEXIS 114605 (D. Ariz. Dec. 2, 2009) ........................12

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
   No. 02 Civ. 9690, 2008 U.S. Dist. LEXIS 44344 (S.D.N.Y. June 4, 2008) ........................22

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*,
   547 U.S. 71 (2006)..........................................................................................6

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
   540 F.3d 1049 (9th Cir. 2008).............................................................................21

*Moore v. Kayport Package Express, Inc.*,
   885 F.2d 531 (9th Cir. 1989)...........................................................................7, 10

*Morgan v. AXT, Inc.*,
   No. C 05-5106, 2005 U.S. Dist. LEXIS 42346 (N.D. Cal. Sept. 23, 2005)........................13

*Nationwide Bank v. Gelt Funding Corp.*,
   27 F.3d 763 (2d Cir. 1994)................................................................................23

*Oestreicher v. Alienware Corp.*,
   544 F. Supp. 2d 964 (N.D. Cal. 2008) ................................................................................ 24

*Openwave Sys., Inc. v. Fuld*,
   No. C 08-5683, 2009 U.S. Dist. LEXIS 48206 (N.D. Cal. June 6, 2009) ......................... x, 7

*Pittleman v. Impac Mortgage Holdings, Inc.*,
   No. CV 07-970, 2009 U.S. Dist. LEXIS 18213 (C.D. Cal. Mar. 9, 2009) .................... 18, 25

*In re Rackable Sys.*,
   No. C 09-0222, 2010 U.S. Dist. LEXIS 2663 (N.D. Cal. Jan. 13, 2010) ............................ 15

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004)................................................................................................. 6

*Rubke v. Capitol Bancorp Ltd.*,
   551 F.3d 1156 (9th Cir. 2009).............................................................................................. 15

*Santa Fe Indus., Inc. v. Green*,
   430 U.S. 462 (1977)............................................................................................................. 9

*Segal Co. (E. States), Inc. v. Amazon.com*,
   280 F. Supp. 2d 1229 (W.D. Wash. 2003)....................................................................... 8, 10

*Shivers v. Amerco*,
   670 F.2d 826 (9th Cir. 1982)................................................................................................ 9

*In re Silicon Graphics, Inc. Sec. Litig.*,
   183 F.3d 970 (9th Cir. 1999)....................................................................................11, 13, 14

*In re Silicon Storage Tech., Inc. Sec. Litig.*,
   No. C 05-0295, 2006 U.S. Dist. LEXIS 14790 (N.D. Cal. Mar. 10, 2006) ......................... 17

*South Ferry LP, #2 v. Killinger*,
   542 F.3d 776 (9th Cir. 2008)................................................................................................ 14

*Starr v. Georgeson S'holder, Inc.*,
   412 F.3d 103 (2d Cir. 2005)................................................................................................. 19

*Steinberg v. Ericsson LM Tel. Co.*,
   No. 07 Civ. 9615, 2008 U.S. Dist. LEXIS 99727 (S.D.N.Y. Dec. 10, 2008) ..................... 10

*TCS Capital Mgmt., LLC v. Apax Partners, L.P.*,
   No. 06 Civ. 13447, 2008 U.S. Dist. LEXIS 19854 (S.D.N.Y. Mar. 7, 2008)........................ 6

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007).......................................................................................................11, 19

*In re Textainer P'ship Sec. Litig.*,
   No. C 05-969, 2007 U.S. Dist. LEXIS 5283 (N.D. Cal. Jan. 10, 2007) ............................. 24

*United States v. SmithKline Beecham Clinical Labs.*,
   245 F.3d 1048 (9th Cir. 2001).............................................................................................. 10

*In re Van Wagoner Funds, Inc. Sec. Litig.*,
 382 F. Supp. 2d 1173 (N.D. Cal. 2004) ........................................................................ 12

*In re Vantive Corp. Sec. Litig.*,
 283 F.3d 1079 (9th Cir. 2002) .................................................................................... 25

*Verona Partners, LLC v. Tenet Capital Partners Convertible Opportunities Fund*
 *LP*, No. C 05-5369, 2006 U.S. Dist. LEXIS 69488 (N.D. Cal. Sept. 18, 2006) ................. 24

*Vess v. Ciba-Geigy Corp. USA*,
 317 F.3d 1097 (9th Cir. 2003) ...................................................................................... 6

*In re Wet Seal, Inc. Sec. Litig.*,
 518 F. Supp. 2d 1148 (C.D. Cal. 2007) ........................................................................ 17

*Williams v. Berkshire Fin. Group, Inc.*,
 491 F. Supp. 2d 320 (E.D.N.Y. 2007) .......................................................................... 24

*In re Worlds of Wonder Sec. Litig.*,
 694 F. Supp. 1427 (N.D. Cal. 1988) .............................................................................. 7

*Zisholtz v. SunTrust Banks, Inc.*,
 No. 08-CV-1287, 2009 U.S. Dist. LEXIS 88465 (N.D. Ga. Sept. 24, 2009) ............... *passim*

*Zucco Partners, LLC v. Digimarc Corp.*,
 552 F.3d 981 (9th Cir. 2009) ......................................................................... 11, 15, 16

## STATUTES

15 U.S.C. § 78u-4(b) ............................................................................................... 6, 11

28 U.S.C. § 1367 ......................................................................................................... 23

## RULES

Federal Rule of Civil Procedure 9(b) ................................................................... *passim*

1

## NOTICE OF MOTION AND MOTION

2

TO PLAINTIFF AND ITS ATTORNEYS OF RECORD:

3

PLEASE TAKE NOTICE that, on June 4, 2010, at 9:00 a.m., in the courtroom of the

4

Honorable Jeffrey S. White of the above-entitled Court, located at 450 Golden Gate Avenue, San

5

Francisco, California, defendants Bank of America Corporation and Banc of America Securities

6

LLC shall and hereby do move the Court for an order dismissing with prejudice plaintiff's First

7

Amended Complaint for Violation of Federal Securities Laws, Fraud and Rescission ("FAC").

8

This motion is brought under the Private Securities Litigation Reform Act of 1995 and

9

Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, on the grounds that the FAC fails

10

to plead fraud with particularity and to state a claim upon which relief may be granted.  This

11

Motion will be based upon this Notice of Motion and Motion, the following Memorandum of

12

Points and Authorities, and the Request for Judicial Notice filed herewith, and files and records in

13

this action.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' NOTICE OF MOTION,
MOTION TO DISMISS, AND MEMORANDUM OF
POINTS AND AUTHORITIES  C08-05245 JSW

**STATEMENT OF ISSUES TO BE DECIDED**

1. The PSLRA and Rule 9(b) require plaintiffs to plead with particularity the circumstances surrounding alleged misrepresentations and market manipulation.  Here, Aeroflex has not described any discussion it had with Banc of America Securities LLC ("BAS"), identified any BAS representative who made the alleged misleading statements, or stated where and when those alleged statements were made.  Nor has Aeroflex identified who allegedly manipulated the ARS auctions at issue, when that manipulation occurred, or how that manipulation was accomplished.  Has Aeroflex satisfied the PSLRA's and Rule 9(b)'s heightened pleading requirements?

2. A Section 10(b) securities-fraud complaint must state particularized facts giving rise to a strong inference at least as compelling as any opposing inference that defendants acted with fraudulent intent.  Here, Aeroflex has identified no specific individuals who had fraudulent intent, nor has it alleged any contemporaneous facts to render an inference of deceptive intent more compelling than the inference that the February 2008 auction failures were merely an unforeseen casualty of the current global financial crisis.  Should the FAC be dismissed because it pleads only fraud by hindsight?

3. Written disclosures about allegedly concealed risks preclude reasonable reliance under Section 10(b).  Here, Aeroflex alleges that it reasonably relied on ARS auctions functioning free of BAS's participation, even though BAS disclosed in writing that it routinely bid in ARS auctions to affect auction results, including to prevent failed auctions.  Has Aeroflex sufficiently pleaded that it reasonably relied on the absence of BAS participation?

4. A securities-fraud complaint must plead facts showing that the alleged loss resulted from defendants' fraud, rather than from market-wide conditions.  Here, Aeroflex's alleged loss occurred when the credit crisis constrained all major broker-dealers from supporting ARS auctions for the first time in ARS' 23-year history.  Does the FAC adequately plead that BAS caused the alleged loss?

1

### SUMMARY OF ARGUMENT[1]

2
Plaintiff Aeroflex Incorporated seeks to recover for lost liquidity arising out of the global

3
credit crisis.  For more than twenty years, investment banks and broker-dealers sold "auction-rate

4
securities" (ARS), long-term yet frequently liquid investments that provided sophisticated

5
institutional investors like Aeroflex "an opportunity . . . to improve the rate of interest received on

6
their cash reserves."[2]  ARS are asset-backed securities that financial institutions underwrite for

7
issuers, and investors trade in periodic auctions in which the securities' interest rates are bid up

8
and down.  In 2007, the subprime-mortgage crisis began, and auctions for ARS backed by

9
subprime-mortgage assets began to fail (meaning that the holders of those securities could not sell

10
them in the periodic auctions).  As the credit crisis spread, the media warned in late 2007 that

11
ARS' "inherent risks," which BAS had disclosed to Aeroflex for months, were "scaring some

12
corporate cash managers away."[3]  But Aeroflex continued to purchase ARS in January 2008, and

13
now opportunistically blames BAS for its own failure to guard against disclosed liquidity risks

14
that materialized in February 2008 amid widely publicized and unprecedented economic

15
conditions.

16
Aeroflex's fraud-by-hindsight allegations illustrate precisely why the PSLRA and Rule

17
9(b) impose heightened pleading requirements.  The FAC fails to describe any interaction that

18
Aeroflex had with BAS or identify a single BAS representative who allegedly made "misleading

19
statements and incomplete disclosures about the nature of the auction market."[4]  Its manipulation

20
allegations are likewise generalized, alleging only that anonymous BAS "executives"

21

---

22
[1]     This memorandum refers to (i) the two defendants, collectively, as "BofA"; (ii) Banc of
America Securities LLC as "BAS"; (iii) Bank of America Corporation as "BAC"; (iv) the Private

23
Securities Litigation Reform Act of 1995 as the "PSLRA"; (v) auction-rate securities as "ARS";
(vi) plaintiff's First Amended Complaint for Violation of Federal Securities Laws, Fraud and

24
Rescission as the "FAC"; (vii) Plaintiff Aeroflex Incorporated as "Aeroflex"; and (viii) the
complaint in *SEC v. Banc of America Securities LLC*, No. 09 Civ. 5170 (S.D.N.Y. filed June 3,

25
2009) as the "SEC Complaint."  And unless otherwise indicated, all emphases in quotations are
added and internal citations and quotation marks are omitted.

26
[2]     (FAC ¶ 16.)

27
[3]     (Megan Johnston, *Firms Caught in Money Lockup*, Financial Week (Sept. 17, 2007)
(Request for Judicial Notice ("RJN") Ex. 10).)

28
[4]     (FAC ¶ 24.)

1   "systematically" manipulated ARS auctions under "tacit understandings" with unnamed ARS

2   issuers.  In fact, BAS warned Aeroflex in writing "that Defendants could engage in the very

3   conduct of which Plaintiff complains."  *In re Citigroup Auction Rate Sec. Litig.*, No. 08 Civ.

4   3095, 2009 U.S. Dist. LEXIS 83046, at *24 (S.D.N.Y. Sept. 11, 2009); *see also Zisholtz v.*

5   *SunTrust Banks, Inc.*, No. 08-CV-1287, 2009 U.S. Dist. LEXIS 88465, at *20-21 (N.D. Ga. Sept.

6   24, 2009); *Openwave Sys., Inc. v. Fuld*, No. C 08-5683, 2009 U.S. Dist. LEXIS 48206, at *14

7   (N.D. Cal. June 6, 2009).  In view of those disclosures, Aeroflex could not have reasonably relied

8   on auctions functioning free from broker-dealer participation.  *See Hunt v. Alliance N. Am. Gov't*

9   *Income Trust, Inc.*, 159 F.3d 723, 730 (2d Cir. 1998).

10          The FAC also fails to plead any particularized facts demonstrating that anyone at BAS

11   had any intent to defraud Aeroflex.  Indeed, absent from the FAC are any facts showing that

12   anyone knew that an impending global financial crisis would render BAS and every other major

13   broker-dealer financially constrained to stop supporting ARS auctions in February 2008 for the

14   first time in history.  Thus, as other courts have concluded in dismissing similar ARS-related

15   claims, the more compelling inference from the FAC's allegations is that deteriorating "market

16   conditions" were responsible for Aeroflex's ARS' illiquidity.  *Citigroup*, 2009 U.S. Dist. LEXIS

17   83046, at *17-21; *see also Defer L.P. v. Raymond James Fin., Inc.*, 654 F. Supp. 2d 204, 217-19

18   (S.D.N.Y. 2009); *SunTrust Banks*, 2009 U.S. Dist. LEXIS 88465, at *14-18.  Similarly, Aeroflex

19   cannot allege that BAS caused its losses, because it cannot isolate the loss due to BAS's conduct,

20   if any, from the loss attributable to the unprecedented marketwide conditions that caused all

21   leading financial institutions to stop supporting auctions.  *See Healthcare Fin. Group, Inc. v.*

22   *Bank Leumi USA*, No. 08 Civ. 11260, 2009 U.S. Dist. LEXIS 101948, at *13-14 (S.D.N.Y. Oct.

23   26, 2009).

24          The FAC contains the same defects that have plagued numerous other ARS-related

25   complaints that courts have dismissed.  Because Aeroflex has already amended its complaint in

26   an attempt to cure those defects and to incorporate other investors' and regulators' allegations

27   against BofA, granting Aeroflex leave to amend would be futile, and the FAC should be

28   dismissed with prejudice.

DEFENDANTS' NOTICE OF MOTION,
MOTION TO DISMISS, AND MEMORANDUM OF
POINTS AND AUTHORITIES  C08-05245 JSW

1

## STATEMENT OF FACTS

2      In January 2008, Aeroflex purchased ARS, long-term bonds that pay interest at rates

3 established by periodic (weekly or monthly) auctions.  (FAC ¶¶ 16, 19.)  After they were first

4 introduced in 1984 (*id.* ¶ 18), ARS grew in popularity because they combined the return of long-

5 term debt with the likely liquidity of a short-term investment, allowing investors like Aeroflex to

6 "improve the rate of interest received on their cash reserves."  (*Id.* ¶ 16.)  This was because

7 despite ARS' long-term maturities, the auctions provided investors the opportunity to sell their

8 ARS in the short term.  (*Id.* ¶¶ 16, 19.)

9      ARS encompass a broad range of bonds issued by a variety of corporations and other

10 entities and backed by a variety of assets, from student loans to high-quality mortgages to

11 subprime mortgages.  Thus, rating agencies gave ARS different ratings depending on the credit

12 quality of the issuer and of the asset pool collateralizing the particular security's cash flow.  For

13 example, the collateral for Aeroflex's ARS "consist[ed] primarily of student loans" that were

14 97% guaranteed by the U.S. Department of Education, thereby earning the securities a AAA

15 rating.  (*Id.* ¶ 2; RJN Ex. 1 at 41.)

16      ARS were sold at different auctions managed by different auction agents.  At the auctions,

17 investors would place bids to buy, sell, or hold a particular ARS at a given interest rate.  (FAC ¶

18 19.)  If there were enough buyers to cover all the offers to sell, the auction agent would then set

19 the uniform "clearing rate," or the lowest rate at which all ARS sellers could find willing buyers.

20 (*Id.* ¶ 21.)  If there were not enough buyers for all available securities, the auction would fail.

21 (*Id.*)  But a failure was not a default—the security paid a guaranteed interest rate defined by the

22 security's offering memorandum.  (*Id.* ¶ 22.)  Rather, an auction failure meant that the ARS

23 holder would not have the opportunity to sell its ARS via the auction process until the next

24 periodic auction.  (*Id.*)

25      Broker-dealers like BAS played several roles in ARS auctions.  They could act (i) on the

26 issuer's behalf by structuring and underwriting ARS issuances and managing ARS auctions, (ii)

27 on investors' behalf by soliciting, receiving, and placing ARS orders, and (iii) on their own behalf

28 by placing ARS orders for their own inventories (from which they sold ARS to customers),

potentially to prevent an auction failure or set the clearing rate.  (*Id.* ¶ 23.)  These various roles were a matter of public record for years:

- In March 2005, after major accounting firms publicly advised that ARS were not "cash equivalents" (*id.* ¶ 39), *The Wall Street Journal* reported that ARS were distinct from true short-term investments because "investors rely on the broker-dealers who conduct the auctions to provide liquidity."  (RJN Ex. 2.)

- The SEC publicly reported in a 2006 administrative order that numerous ARS broker-dealers, including BAS, underwrote ARS, managed auctions, and "intervened in auctions by bidding for their proprietary accounts. . . ." (*Id.* Ex. 3, at 3-6.)  The SEC acknowledged that broker-dealers were not prohibited from doing so "when properly disclosed."  (*See id.* at 6 n.6.)

Following the SEC's 2006 order, BAS publicly disclosed its various auction roles in a document that remains on its website to this day.  (FAC ¶ 75; *see* RJN Ex. 4.)  BAS reiterated those disclosures in e-mails directly to Aeroflex, which attached "Important Auction Rate Securities Disclosures" and also directed Aeroflex to BAS's website disclosures, "available at http://www.bofa.com/auctionpractices."  (*See, e.g.*, RJN Exs. 5 & 6.)  BAS disclosed on its website (and in its e-mails to Aeroflex) the potential conflicts that could arise from BAS's roles on both sides of ARS auctions:

> [i]n connection with any issue of auction rate securities, BAS may serve as underwriter and/or broker-dealer and may also purchase auction rate securities for its own account.  Given these various roles, for any given auction, BAS may have different or conflicting interests (i.e. . . . an interest in a lower clearing rate to benefit its issuer or obligated party client; or an interest in a higher clearing rate to benefit its investing customers or itself as investor).

(*Id.* Ex. 4 at 3; *see also id.* Ex. 5.)  BAS disclosed that it "routinely" participated in auctions for its own account:  "BAS is permitted, but is not obligated, to submit orders for its own account either as a bidder or as a seller, and *routinely does so in its sole discretion*."  (*Id.* Ex. 4 at 1; *see also id.* Ex. 5.)  The disclosures informed investors like Aeroflex that BAS could bid "even after obtaining knowledge of some or all of the other orders submitted through it."  (*Id.* Ex. 4 at 1.)  That bidding was "likely" to affect auction results because:

- the auction clearing rate is likely to be higher or lower than the clearing rate that would have prevailed if BAS had not bid, including preventing the clearing rate from becoming the "Maximum Rate" (as described below); and/or

- the allocation of securities is likely to be affected, including the displacement of prospective holders who may have their bids rejected or receive fewer securities than they would have received if BAS had not bid.

(*Id.* Ex. 4 at 1; *see also id.* Ex. 5.)

Although auctions had proceeded without significant failures since ARS were first sold in 1984 (FAC ¶ 18), BAS disclosed the possibility that an auction could fail:

If the total par amount of sell orders received by the Auction Agent exceeds the total par amount of bids at rates lower than the Maximum Rate received by the Auction Agent for the Auction Rate Securities being auctioned, the auction is said to be a "Failed Auction."

(RJN Ex. 4 at 2; *see also id.* Ex. 5.)  BAS further cautioned that if an auction were to fail, Aeroflex would not be able to sell its ARS:

As a result, holders of such auction rate securities that submitted sell orders are not able to sell their securities in that auction, and the interest rate for the next interest rate period defaults to a pre-defined "Maximum Rate", as specified in the program documents for the particular security. . . .  This rate is designed to compensate holders for the *loss of liquidity* resulting from a Failed Auction . . . .  Although the Maximum Rate is generally above a market rate, *holders may be disadvantaged if there is a Failed Auction because they are not able to exit their positions* by means of the Auction.

(*Id.* Ex. 4 at 1; *see also id.* Ex. 5.)  BAS told Aeroflex that it would try—but had no obligation—to prevent auction failures by intervening for its own account:  "Such bids submitted by BAS may be designed to prevent a Failed Auction . . . however, BAS is not obligated to place such a bid in any auction, or to continue to place such bids."  (*Id.* Ex. 4 at 1; *see also id.* Ex. 5.)  Thus, "[i]nvestors should not assume that BAS will place a bid in any particular auction, or that Failed Auctions or unfavorable rates will not occur."  (*Id.* Ex. 4 at 1; *see also id.* Ex. 5.)

BAS's website and e-mail disclosures supplemented those in publicly available offering memoranda ("OM") for ARS that Aeroflex claims to have purchased (*see* FAC, Schedule A).  For example, the OM for ARS issued by the Higher Education Loan Authority of the State of Missouri also warned about broker-dealers' role in auctions and the risk of auction failure:

- "Each Broker-Dealer *routinely places bids in auctions generally for its own account to acquire Auction Rate Bonds for its inventory, to prevent an "Auction Failure . . . or to prevent an auction from clearing at a rate that the Broker-Dealer believes does not reflect the market for such Auction Rate Bonds. . . .* A Broker-Dealer may place such Bids even after obtaining knowledge of some or all of the other Orders submitted through it." (RJN Ex. 1 at 21.)

- "[T]he fact that an Auction clears successfully does not mean that an investment in the Auction Rate Bonds subject to such Auction involves no significant liquidity or credit risk. *A Broker-Dealer is not obligated to continue to place such Bids in any particular Auction to prevent an Auction Failure* or an Auction from clearing at a rate the Broker-Dealer believes does not reflect the market for the Auction Rate Bonds. *Investors should not assume that the Broker-Dealer will place Bids or that Auction Failures will not occur.*" (*Id.* at 22.)

- "[T]he *Broker-Dealer's interests* in serving as a Broker-Dealer in an Auction for the Auction Rate Bonds *may differ from those of Existing Owners and Potential Owners who participate in Auctions* for the Auction Rate Bonds." (*Id.* at 21.)

- "Auction Failures are possible, *especially . . . if a market disruption were to occur or if, for any reason, the Broker-Dealers were unable or unwilling to Bid.*" (*Id.* at 23.)

- "[T]here can be *no assurance that a secondary market for the Auction Rate Bonds will develop . . . .*" (*Id.*)

The risks of which Aeroflex was warned—failed auctions and illiquidity—began to materialize in late 2007 and early 2008. During that time, Aeroflex had access to plentiful public information about the spreading economic crisis, including the potential effect on ARS. While the credit crisis began with subprime mortgages, "[t]he market for asset-backed securities, where consumer debt from home loans to credit cards is packaged, [was] hit hard by the fallout in the subprime-mortgage market." (Anusha Shrivastava, *Asset-Backed Securities Feel the Subprime Pinch*, Wall St. J., at C5 (Aug. 13, 2007) (RJN Ex. 7); *see also* Michael Rapoport, *In the Money: Who Might be Next For A Subprime Writedown*, Dow Jones Newswires (Dec. 18, 2007) (*id.* Ex. 8) (observing that credit crisis quickly "spread through the credit markets" to other "types of financial instruments . . . beyond mortgage securities").) As Fitch Ratings, Ltd., one of three nationally recognized credit-rating agencies, publicly reported on December 19, 2007, ARS were no exception:

Since August, a lack of liquidity in the credit markets has resulted

> in a higher cost of funds for both term securities and commercial paper . . . . While the auction markets appeared to be insulated early on, by September, auction rate spreads began to widen and continue to trade wide of historic levels.

(*See* Fitch, *Auction-Rate Market Disruptions May Place Stress on U.S. Student Loan ABS* (Dec. 19, 2007) (RJN Ex. 9).)

Aeroflex thus knew that investors were pricing increased risk in ARS, because it knew that "higher interest rates" were "an indicator of higher risk."  (FAC ¶ 35.)  Indeed, *Financial Week* reported in September 2007 that "[a]t least 60 auctions have failed in recent weeks," "which could represent as much as $6 billion" in ARS.  (Megan Johnston, Financial Week, *Firms Caught in Money Lockup* (Sept. 17, 2007) (RJN Ex. 10).)  Thus, "[c]ompanies that have been using auction-rate securities to boost yields on their spare cash may soon find that cash tied up for who knows how long, as the credit crunch undermines one of corporate treasurers' favorite cash-management techniques."  (*Id.* (noting that ARS' "inherent risks that have abruptly come to light [we]re scaring some corporate cash managers away"); Randall Smith & Shefali Anand, *Bond Tumult is Jostling Auction-Rate Securities—Demand Vanished For Issues Backed by Risky Assets*, Wall St. J., at C2 (Oct. 5, 2007) (RJN Ex. 11) (observing that ARS were "one of the casualties of the credit-market turmoil").)

Aeroflex nevertheless purchased eight ARS in January 2008 that it continues to hold.  (*See* FAC, Schedule A.)  By February 13, 2008, as the economic panic spread beyond ARS backed by riskier subprime collateral, most ARS auctions failed.  (*Id.* ¶¶ 8, 43.)  The crisis deepened thereafter, leaving few, if any, willing buyers in ARS auctions, although Aeroflex, like many ARS investors, continues to receive interest on its investments.  (*Id.* ¶¶ 22, 43.)

## ARGUMENT

### I. THE FAC DOES NOT PLEAD FRAUD WITH THE PARTICULARITY THAT RULE 9(b) AND THE PSLRA REQUIRE.

Aeroflex alleges that BAS manipulated the ARS market in violation of Section 10(b) of the Securities Exchange Act and Rule 10b-5(a) and (c) (Count I), by (i) "making misleading statements and incomplete disclosures about the nature of the auction market"; (ii) "systematically intervening in virtually every auction for which BAS served as the sole or lead

auction dealer to the extent necessary to prevent an auction from failing"; and (iii) "routinely

intervening in auctions to set the rates of interest or dividends paid on those securities."  (FAC ¶

24.)  These generalized allegations do not satisfy the heightened pleading requirements of either

Rule 9(b) or the PSLRA.

### A.    Aeroflex's "manipulative conduct" allegations are based on unparticularized misrepresentations and omissions.

Where a complaint attempts to plead manipulation through "alleged misrepresentations or

omissions, plaintiffs have not made out a market manipulation claim under Rule 10b-5(a) and (c),

and remain subject to the [PSLRA's] heightened pleading requirements" for misrepresentation

claims.  *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 177 (2d Cir. 2005); *see TCS Capital

Mgmt., LLC v. Apax Partners, L.P.*, No. 06 Civ. 13447, 2008 U.S. Dist. LEXIS 19854, at *63

(S.D.N.Y. Mar. 7, 2008) ("Plaintiff merely re-labels the alleged misstatements and omissions as

'manipulative and deceptive conduct.'  This sleight of hand does not magically transform its

disclosure claim into a market manipulation claim.").  Here, "misleading statements and

incomplete disclosures" underlie all of Aeroflex's allegations (FAC ¶ 24), even those relating to

BAS "systematically placing support bids to suppress auction failures" (*id.* ¶ 40; *see also id.* ¶¶

29, 31).  Indeed, the FAC contends that such support bids were wrongful not because they were

manipulative, but because "BAS *did not disclose* the extent of its interventions, the purpose of its

interventions, or the impact of its interventions . . . ."  (*Id.* ¶ 40; *see also id.* ¶¶ 7, 29, 31, 37, 38,

42.)  Aeroflex's misrepresentation-and-omission allegations must therefore satisfy both the

PSLRA's and Rule 9(b)'s particularity requirements.  They fail on both counts.

A securities-fraud complaint violates the PSLRA unless it "specif[ies] each misleading

statement" that the defendant allegedly made.  *Merrill Lynch, Pierce, Fenner & Smith, Inc. v.

Dabit*, 547 U.S. 71, 81-82 (2006); *see* 15 U.S.C. § 78u-4(b)(1).  Similarly, Rule 9(b) requires a

complaint to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify

the speaker, (3) state where and when the statements were made, and (4) explain why the

statements were fraudulent."  *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004); *see also Vess

v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) ("Averments of fraud must be

1    accompanied by 'the who, what, when, where, and how' of the misconduct charged. . . .  [A]

2    plaintiff must set forth *more* than the neutral facts necessary to identify the transaction.  The

3    plaintiff must set forth what is false or misleading about a statement, and why it is false.")

4    (emphasis in original).

5           The FAC does not identify a single statement that BAS allegedly made in the course of

6    Aeroflex's ARS purchases.  Rather, it only alleges generally that "BAS failed to disclose to

7    Plaintiff that it invariably placed support bids" (FAC ¶ 29)—a practice that BAS disclosed (*see*

8    *infra* at 9-10)—and "described BA ARS as highly liquid, safe investments similar to money

9    market funds" (*id.* ¶ 38).  Nowhere does the FAC (i) describe *any* discussion between BAS and

10   Aeroflex, (ii) identify *any* BAS representative who made the alleged statements, or (iii) state

11   where and when those alleged statements were made.  Thus, the FAC's conclusory allegations

12   should be dismissed under the PSLRA and Rule 9(b).  *See Openwave*, 2009 U.S. Dist. LEXIS

13   48206, at *12 (dismissing ARS investor's misrepresentation claims under Rule 9(b) even where

14   complaint, unlike the FAC, "identifie[d] the content of some specific misstatements and

15   omissions").

**B.     Even if the FAC had alleged manipulative conduct not based on
16              misrepresentations or omissions, its general and conclusory allegations would
17              violate Rule 9(b).**

18          Section 10(b) market-manipulation claims are also subject to Rule 9(b), which requires

19   Aeroflex to allege with particularity "what manipulative acts were performed, which defendants

20   performed them, when the manipulative acts were performed, and what effect the scheme had on

21   the market for the securities at issue."  *ATSI Commc'ns, Inc. v. The Shaar Fund, Ltd.*, 493 F.3d

22   87, 102 (2d Cir. 2007); *see also Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 540 (9th

23   Cir. 1989) ("While statements of the time, place and nature of the alleged fraudulent activities are

24   sufficient, mere conclusory allegations of fraud are insufficient.").

25          The FAC supplies none of the factual detail that Rule 9(b) requires, such as who

26   manipulated what market and how the manipulation was accomplished.  First, the FAC flouts

27   Rule 9(b)'s requirement that a plaintiff "distinguish among those he sues and enlighten each

28   defendant as to his or her part in the alleged fraud."  *In re Worlds of Wonder Sec. Litig.*, 694 F.

1   Supp. 1427, 1432 (N.D. Cal. 1988).  Rather, the FAC does not identify a single BAS

2   representative and instead broadly refers to "BAS" (*see, e.g.*, FAC ¶¶ 26-31) and, in one instance,

3   unnamed "BAS executives" (*id.* ¶ 77; *see also id.* ¶ 76).  Such references fail under Rule 9(b)

4   because they are "too vague to sufficiently identify the alleged perpetrators."  *Segal Co. (E.*

5   *States), Inc. v. Amazon.com*, 280 F. Supp. 2d 1229, 1231 (W.D. Wash. 2003).

6       Second, a complaint must cite specific conduct to satisfy Rule 9(b).  *See id.* (citing cases

7   holding that "specificity requirement not met without specific references to conduct or statements

8   made by defendant").  The FAC, however, recites only generalized and conclusory allegations

9   that BAS (i) "followed a uniform policy of placing support bids, if needed to prevent auction

10  failures, in virtually every auction for which it was sole or lead auction dealer" (FAC ¶ 27; *see*

11  *also id.* ¶¶ 5, 24-25, 40); and (ii) "set," "manage[d]," "assert[ed] control over," and "rigg[ed]"

12  ARS interest rates and auction clearing rates (*id.* ¶¶ 33, 35, 36, 48).  Nowhere does the FAC (i)

13  list a single auction in which BAS intervened (let alone describe BAS's allegedly "uniform"

14  intervention policy or even articulate why such intervention is improper); or (ii) provide a single

15  interest rate or clearing rate that BAS "rigg[ed]" (let alone explain how the "rigging" occurred or

16  Aeroflex was misled).

17      The court in *In re Citigroup Auction Rate Securities Litigation* recently dismissed an ARS

18  complaint for similar reasons.  *See Citigroup*, 2009 U.S. Dist. LEXIS 83046, at *31.  Just as the

19  *Citigroup* complaint alleged that defendants "regularly and increasingly intervened . . . to prevent

20  failed auctions," *id.* at *4, Aeroflex alleges that BAS "*invariably* placed support bids . . . *as*

21  *necessary* to prevent auction failures" (FAC ¶ 29).  This practice, according to the *Citigroup*

22  complaint, concealed that "supply exceeded demand," just as Aeroflex argues, in similarly

23  generalized terms, that BAS's bids "created the outward appearance . . . that the auction rate

24  securities market functioned by the natural interplay of supply and demand."  (*Id.*)  *Compare*

25  FAC ¶¶ 5, 27, 29, 30, 31 *with Citigroup*, 2009 U.S. Dist. LEXIS 83046, at *4.  Neither complaint

26  "include[s] specific allegations as to which Defendants performed what manipulative acts at what

27  times and with what effect," and instead "relies on general and conclusory allegations regarding

28  Defendants' practices in connection with ARS auctions."  *Citigroup*, 2009 U.S. Dist. LEXIS

1   83046, at *17; *see also SunTrust Banks*, 2009 U.S. Dist. LEXIS 88465, at *19-20 (dismissing

2   with prejudice manipulation claims that defendants "intervened in the auctions by placing support

3   bids").

4        Nor does the FAC particularize BAS's alleged agreements with ARS issuers to

5   manipulate the market. Aeroflex simply alleges that BAS placed "systematic" support bids

6   "pursuant to a tacit understanding among BAS and the issuers of BA ARS" (FAC ¶¶ 26, 30),

7   without particularizing even the most basic facts about any such unspoken agreement(s), such as

8   who made it (or them), how, and when. Furthermore, neither the SEC Complaint nor the New

9   York Attorney General's Assurance of Discontinuance on which Aeroflex relies (*see id.* ¶¶ 76-

10  79) (i) mention any auction that BAS allegedly manipulated (indeed, their allegations do not even

11  include the word "manipulation"), or (ii) identify any BAS agreement (tacit or otherwise) with an

12  ARS issuer.

13       **C.    BAS disclosed the conduct that Aeroflex alleges was manipulative.**

14       Disclosure of the allegedly manipulative conduct precludes a Section 10(b) manipulation

15  claim. *See Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 477 (1977) (holding that allegedly unfair

16  but disclosed conduct cannot state market-manipulation claim under Section 10(b) and Rule 10b-

17  5); *ATSI Commc'ns*, 493 F.3d at 101 (deeming securities not manipulative "so long as their terms

18  are fully disclosed"); *Shivers v. Amerco*, 670 F.2d 826, 829 (9th Cir. 1982) (observing that

19  conduct is not manipulative where its nature and surrounding facts are disclosed). BAS's website

20  and e-mail disclosures (and other publicly available information) directly addressed the conduct

21  of which Aeroflex complains, namely, that BAS "routinely" participated in auctions (FAC ¶ 24),

22  which could affect clearing rates and prevent failures. (*See* RJN Ex. 4 at 1; *see also* RJN Ex. 1 at

23  21.) Such disclosures are "fatal" to Aeroflex's market-manipulation claim:

24              [Materials available to plaintiff] all disclosed that Defendants could
                engage in the very conduct of which Plaintiff complains, the
25              advantages that Defendants would have if they did engage in such
                conduct, the ability of such conduct to affect clearing rates and the
26              possibility that the auctions would fail if Defendants did not
                intervene in them. . . . These documents disclosed that the ARS
27              market was not necessarily set by the "natural interplay of supply
                and demand," but that they could be set by broker-dealers . . . .

28

DEFENDANTS' NOTICE OF MOTION,
MOTION TO DISMISS, AND MEMORANDUM OF
POINTS AND AUTHORITIES  C08-05245 JSW

1 | *Citigroup*, 2009 U.S. Dist. LEXIS 83046, at *24.

2 |    Equally meritless are Aeroflex's two attempts to portray BAS's disclosures as

3 | "incomplete." (FAC ¶ 24.) First, BAS's disclosures refute the FAC's allegation that BAS

4 | "suggested" it intervened in auctions "only sporadically." (*Id.* ¶ 40.) In fact, BAS disclosed that

5 | it "routinely" "submit[ted] orders for its own account" (RJN Ex. 4 at 1; *see also* RJN Ex. 1 at 21.)

6 | And BAS had no obligation to employ the other adverbs and adjectives that Aeroflex uses to

7 | characterize BAS's disclosed conduct. (*See id.* ¶ 29 ("invariably"); *id.* ("extensive and

8 | sustained"); *id.* ¶ 30 ("systematically").) *See Steinberg v. Ericsson LM Tel. Co.*, No. 07 Civ.

9 | 9615, 2008 U.S. Dist. LEXIS 99727, at *35 (S.D.N.Y. Dec. 10, 2008) ("[D]efendants are under

10 | no duty to employ the adjectorial characterization that the plaintiffs believe is more accurate.").

11 |    Second, Aeroflex alleges in conclusory fashion that BAS did not disclose that it planned

12 | with other broker-dealers to withdraw support from all ARS auctions. (*See* FAC ¶ 7.) But the

13 | FAC alleges nothing to support this fanciful "plan" allegation: it neither identifies the parties to

14 | this "plan," nor specifies when or how they made the plan. Rather, it only alleges vaguely that

15 | the planning occurred "sometime around" or "in and around" Aeroflex's ARS purchases. (FAC

16 | ¶¶ 42, 90.) These unparticularized allegations would not meet even Rule 8's liberal notice-

17 | pleading standard, let alone Rule 9(b)'s heightened standard. *See Bell Atlantic Corp. v. Twombly*,

18 | 550 U.S. 544, 553-54 (2007) (allegations of "conscious parallelism"—*i.e.*, the "common reaction

19 | of firms in a concentrated market that recognize their shared economic interests and their

20 | interdependence"—do not state an antitrust claim); *United States v. SmithKline Beecham Clinical

21 | Labs.*, 245 F.3d 1048, 1051-52 (9th Cir. 2001) (holding that complaint with no dates or times

22 | failed under Rule 9(b)); *Moore*, 885 F.2d at 541 (rejecting allegation that fraud "[c]ommenc[ed]

23 | on or about October, 1982, and through and including March, 1983"); *Segal Co. (E. States), Inc.*,

24 | 280 F. Supp. 2d at 1231 (rejecting allegation that fraud occurred over "several weeks").

25 | **II. THE FAC'S FACTUAL ALLEGATIONS DO NOT GIVE RISE TO A "STRONG INFERENCE" THAT BAS ACTED WITH SCIENTER.**

26 |

27 |    As this Court has recognized, "[t]he heightened standard set by the PSLRA was intended

28 | to put an end to securities fraud lawsuits that plead 'fraud by hindsight.'" *In re Ditech Commc'ns*

1      *Corp. Sec. Litig.*, No. C 05-2406, 2007 U.S. Dist. LEXIS 78411, at \*15 (N.D. Cal. Oct. 11, 2007)

2      (White, J.) (quoting *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 988 (9th Cir. 1999)). A

3      Section 10(b) complaint must therefore "state with particularity facts giving rise to a *strong*

4      inference that the defendant acted with" scienter, or the intent to deceive, manipulate, or defraud.

5      *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007) (quoting 15 U.S.C. § 78u-

6      4(b)(2)). An inference of fraudulent intent is not "strong" unless it is "more than merely plausible

7      or reasonable—it must be cogent and at least as compelling as any opposing inference of

8      nonfraudulent intent." *Id.*; *see Zucco Partners*, *LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th

9      Cir. 2009) ("A court must compare the malicious and innocent inferences cognizable from the

10     facts pled in the complaint, and only allow the complaint to survive a motion to dismiss if the

11     malicious inference is at least as compelling as any opposing innocent inference."). A complaint

12     can meet that standard only by alleging, "in *great* detail, facts that constitute *strong* circumstantial

13     evidence" that defendants *deliberately* or *consciously* concealed the truth. *Glazer Capital Mgmt.,*

14     *LP v. Magistri*, 549 F.3d 736, 745 (9th Cir. 2008); *see Glenbrook Capital Ltd. P'ship v. Kuo*, No.

15     C 07-2377, 2009 U.S. Dist. LEXIS 30745, at \*33-34 (N.D. Cal. Mar. 30, 2009) (White, J.) ("[T]o

16     establish the requisite scienter, the SAC must support the strong inference that Defendants acted

17     deliberately reckless by making a highly unreasonable omission that is an extreme departure from

18     the standards of ordinary care."). The FAC's generalized allegations do not satisfy this exacting

19     standard.

20          **A.**     **The FAC does not identify who allegedly defrauded Aeroflex.**

21         A corporate entity like BAS lacks fraudulent intent unless its representatives have

22     fraudulent intent. *See, e.g.*, *McCasland v. Formfactor Inc.*, No. C 07-5545, 2008 U.S. Dist.

23     LEXIS 60544, at \*23 (N.D. Cal. July 25, 2008) ("[A] corporation is deemed to have the requisite

24     scienter for fraud only if the individual corporate officer making the statement has the requisite

25     level of scienter at the time of the statement."); *In re Int'l Rectifier Corp. Sec. Litig.*, No. CV 07-

26     2544, 2008 U.S. Dist. LEXIS 44872, at \*66-67 (C.D. Cal. May 23, 2008) (same) (quoting *In re*

27     *Apple Computer, Inc. Sec. Litig.*, 243 F. Supp. 2d 1012, 1023 (N.D. Cal. 2002)).

28         Aeroflex, however, does not identify a single BAS representative who intended to defraud

DEFENDANTS' NOTICE OF MOTION,
MOTION TO DISMISS, AND MEMORANDUM OF
POINTS AND AUTHORITIES C08-05245 JSW

1    it.  In fact, it does not even identify the BAS account representative from whom Aeroflex

2    purchased ARS.  Instead, the FAC refers only vaguely to "BAS" throughout (*see, e.g.*, FAC ¶¶

3    26-31) and, in one instance, to unnamed "BAS executives" who speculated at various times about

4    whether the emerging global credit crisis would affect demand for ARS (*see id.* ¶ 77).  Absent

5    from the FAC, however, are any allegations linking this internal speculation to Aeroflex, its BAS

6    account representative, or the unprecedented February 2008 withdrawal by all broker-dealers

7    from most auctions.  Nor does BAS's alleged "business decision to withdraw its support of"

8    auctions (*id.* ¶ 57; *see also id.* ¶ 7) permit an inference that BAS collectively intended to defraud

9    ARS investors like Aeroflex.  That decision and the handful of internal e-mails on which

10   Aeroflex relies are a far cry from the "dramatically false," "public" factual misstatements by a

11   company from which collective scienter could theoretically be inferred—but which no Ninth

12   Circuit court has ever done.  *Glazer Capital Mgmt., LP*, 549 F.3d at 744 (citing *Makor Issues &*

13   *Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 710 (7th Cir. 2008)); *see also Raymond James*, 654 F.

14   Supp. 2d at 219 (determining that magnitude of alleged fraud in ARS action did not support

15   scienter inference); *In re Medicis Pharm. Corp. Sec. Litig.*, No. CV-08-1821, 2009 U.S. Dist.

16   LEXIS 114605, at *49 (D. Ariz. Dec. 2, 2009) (rejecting collective-scienter inference and

17   observing that "'the most straightforward way to raise an inference of scienter . . . will be to plead

18   it for an individual defendant[,]' such as a corporate executive") (alterations in original).

**B.    The FAC fails to particularize facts constituting strong circumstantial evidence of intentional or conscious misconduct.**

19

20        A plaintiff can adequately plead scienter only by alleging particularized facts showing that

21   the defendants had scienter *at the time* of their alleged conduct.  *See, e.g.*, *In re Van Wagoner*

22   *Funds, Inc. Sec. Litig.*, 382 F. Supp. 2d 1173, 1184 (N.D. Cal. 2004) (White, J.) ("In the absence

23   of specifics, a court cannot determine whether there is any basis for alleging that the defendants

24   knew that their statements were false *at the time they were made*.").  Aeroflex attempts to satisfy

25   this requirement by relying on two categories of contemporaneous documents:  (i) an

26   anonymously authored December 17, 2007 presentation to the State of California, an issuer of

27   municipal ARS that Aeroflex did not purchase; and (ii) a handful of e-mails cited in the SEC

28

- 12 -

1   Complaint reflecting a few BAS employees' concerns about the demand for various securities,

2   including ARS, amid rapidly deteriorating economic conditions.  Neither category of documents

3   depicts the deliberate or conscious misconduct that the PSLRA requires.

4           1.      *The FAC's reference to an isolated presentation is inconclusive.*

5           A complaint relying on documents to "exhibit[] internal knowledge" must "'detail with

6   particularity the content of such'" documents and "such facts as may indicate [the documents']

7   reliability." *Bennett v. H&R Block Fin. Advisors, Inc.*, No. C 04-4848 MHP, slip op. at 10 (N.D.

8   Cal. June 1, 2005) ("*Bennett I*") (attached at Tab 1) (quoting *Silicon Graphics*, 183 F.3d at 985).

9   The FAC relies extensively on a single document purportedly showing BAS's internal knowledge

10  that ARS auctions were "unsustainable."  (FAC ¶ 53.)  It alleges that BofA created a December

11  17, 2007 presentation to warn the State of California, a municipal ARS issuer, about "significant

12  dislocation" in ARS auctions, which had allegedly left BAS with "much higher" ARS inventory.

13  (*Id.*)  Nowhere, however, does the FAC allege particularized facts that indicate the document's

14  reliability, such as (i) who prepared it, (ii) based on what sources, and (iii) whether it was in fact

15  delivered.  And in any event, certain employees' knowledge of "significant dislocation" does not

16  equate to knowledge that all ARS auctions would fail less than two months later.  *See Morgan v.*

17  *AXT, Inc.*, No. C 05-5106, 2005 U.S. Dist. LEXIS 42346, at *37 (N.D. Cal. Sept. 23, 2005)

18  (defendants' knowledge that large customer canceled its orders because of non-conforming

19  products did not support strong inference that defendants "knew that the non-conforming . . .

20  shipments were part of a *widespread* quality problem with [the] products").  To the contrary, the

21  FAC's excerpts from the presentation reveal that BAS did not know what would happen to future

22  ARS auctions:  the presentation mentions "significant *uncertainty*" about ARS pricing and

23  concludes that "[i]t is *not clear* whether investor demand will return in the size required to

24  achieve previous pricing levels."  (FAC ¶ 53.)  And because BofA allegedly created this

25  presentation for a *municipal* ARS issuer, it does not support any inference about other unrelated

26  ARS segments, such as student-loan-backed ARS that Aeroflex primarily held, which the FAC

27  does not allege had at that time ever experienced an auction failure.

28

2.      *The FAC's allegations regarding regulatory settlements are insufficient.*

The FAC's allegations about BAS's settlements with the SEC and New York Attorney General likewise do not support a strong inference that BAS had fraudulent intent.  *See, e.g.*, *Glazer*, 549 F.3d at 748 (holding that allegations of regulatory settlements are not "particularized facts giving rise to a strong inference of scienter").  Equally deficient are the FAC's references to a few cherry-picked internal BAS e-mails quoted in the SEC Complaint (FAC ¶ 76), which do not show that any BAS representative knew—let alone "deliberately or consciously" concealed from Aeroflex—that ARS auctions would fail *en masse* in February 2008 for the first time in history. Rather, the e-mails demonstrate merely that a few BAS employees were concerned, like countless others in the financial community, about whether the spreading financial crisis would affect demand for various securities, including ARS, at various points in time.  Indeed, the FAC itself characterizes the e-mails with words like "possibility," "concern[]," and "risk" of auction failure. (*Id.*)  U.S. Trust, a division of nonparty Bank of America, N.A. that had no connection to Aeroflex, shared those concerns when it recommended against ARS purchases to its clients in late-January 2008.  (*Id.* ¶ 77.)  But *U.S. Trust's* caution as a discretionary money manager does not imply *BAS's* knowledge as a non-discretionary broker-dealer that ARS auctions would likely fail.  Only from the FAC's fraud-by-hindsight perspective after the early-February 2008 auction failures could such scienter be inferred.  *See In re Ditech*, 2007 U.S. Dist. LEXIS 78411, at *15 (holding that "[t]he heightened standard set by the PSLRA was intended to put an end to securities fraud lawsuits that plead 'fraud by hindsight'") (quoting *In re Silicon Graphics*, 183 F.3d at 988).

**C.      The FAC's allegations as a whole do not give rise to a strong scienter inference.**

After considering a complaint's scienter allegations individually, this Court should also consider whether "the totality of circumstances" nonetheless raises a strong inference of scienter. *South Ferry LP, #2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008).  This entails "a holistic review" to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness.  *Id.*  "Even if a set of allegations" creates an

- 14 -

1    inference that is "greater than the sum of its parts, it must still be at least as compelling as an

2    alternative innocent explanation." *Zucco Partners, LLC*, 552 F.3d at 1006.  In evaluating this

3    inference, courts can consider allegations that cannot themselves support a strong scienter

4    inference, such as allegations that a defendant had the motive and opportunity to commit fraud.

5    *See, e.g.*, *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1166 (9th Cir. 2009) ("Even considered

6    holistically, under *Tellabs*, these motive allegations cannot support a strong inference of

7    scienter."); *In re Rackable Sys.*, No. C 09-0222, 2010 U.S. Dist. LEXIS 2663, at *13 (N.D. Cal.

8    Jan. 13, 2010) ("Facts that establish a motive and opportunity . . . are not sufficient to create a

9    strong inference of deliberate recklessness.").  The FAC's allegations that BAS had a motive and

10   opportunity to commit fraud are similarly inadequate.

11            1.    *The FAC does not allege that BAS was motivated to defraud Aeroflex.*

12            The FAC advances three allegations—each more vague than the last—in an attempt to

13   ascribe a motive to commit fraud to BAS.  First, it alleges that BAS earned "substantial" fees

14   from ARS issuers (FAC ¶¶ 44), a disclosed profit-making motive common to all companies that

15   is "hardly indicative of scienter." *Rubke*, 551 F.3d at 1166 (rejecting allegations regarding

16   defendant's profit motive); *see also In re Doral Fin. Corp. Sec. Litig.*, 563 F. Supp. 2d 461, 465

17   n.1 (S.D.N.Y. 2008) (finding allegations that defendants earned fees insufficient to plead

18   motive).  Neither that allegation nor the FAC's unparticularized allegation that "BAS generally

19   served as an auction dealer . . . and was paid an annualized auction dealer fee" (FAC ¶ 45)—a

20   role that BAS disclosed to Aeroflex—(i) identifies any specific fees that BAS earned for

21   underwriting Aeroflex's ARS offerings or managing auctions for those ARS; (ii) alleges that BAS

22   earned any such fees with knowledge that all ARS auctions were about to fail; or (iii) explains

23   how earning those fees outweighed the cost to BAS of holding $2.8 billion of allegedly risky

24   ARS in its own account (*see id.* ¶ 70).  In that regard, the FAC lacks any particularized facts

25   showing that BAS earned more money by allowing ARS auctions to fail.  *See McCasland v.*

26   *FormFactor Inc.*, No. C 07-5545, 2009 U.S. Dist. LEXIS 59996, at *22-23 (N.D. Cal. July 14,

27   2009) (finding no strong inference of scienter where facts inconsistent with plaintiffs' theory of

28   fraud).

- 15 -

1          Second, Aeroflex's vague allegations that "BAS was under constant pressure to reduce its

2     inventory" (FAC ¶ 52) cannot support a compelling scienter inference because all businesses

3     routinely aim to reduce their product inventory.  *See Zucco Partners, LLC*, 552 F.3d at 1006

4     (holding that "mere generalized assertions about routine business objectives" cannot support a

5     strong scienter inference).  The FAC tries to cast BAS's routine business objective in a sinister

6     light by focusing on the SEC Complaint's allegation that one BAS manager expressed a specific

7     desire to reduce BAS's inventory on December 6, 2007.  (FAC ¶ 76.)  Putting aside the legitimate

8     business reasons for inventory management, BAS disclosed that inventory level to Aeroflex:   it

9     regularly e-mailed its inventory schedules to investors like Aeroflex—including on December

10    6—so those investors could observe the amount of each ARS that BAS held, and follow BAS's

11    inventory levels throughout the relevant time period in late 2007 and early 2008.  (*See* RJN Exs. 5

12    & 6.)  *See In re Dot Hill Sys. Corp. Sec. Litig.*, 594 F. Supp. 2d 1150, 1160 (S.D. Cal. 2008)

13    (holding that disclosures undermine scienter inference).

14          Furthermore, Aeroflex's borrowed allegation from the SEC Complaint contains no facts

15    showing that the "concerned" BAS manager who wanted to reduce BAS's ARS inventory ever

16    communicated that desire to *any* sales representative, let alone *Aeroflex's* sales representative.

17    (FAC ¶ 76.)  *See SunTrust Banks*, 2009 U.S. Dist. LEXIS 84685, at *15, 17-18 (rejecting as

18    "weak and convoluted" scienter inference that "requires the Court to assume that . . . the same

19    corporate officials" communicated with brokers "who in turn" communicated with customers);

20    *see also Raymond James*, 657 F. Supp. 2d at 218 (finding weak scienter inference where

21    complaint failed to allege that defendants communicated with each other).  In that regard, the

22    complaint in *Bennett v. H&R Block Financial Advisors, Inc.*—which Judge Patel dismissed—was

23    *more* particularized than the FAC because the high-level H&R Block manager who had concerns

24    about Enron bonds had "notified his representatives and branch managers." *Bennett I*, slip op. at

25    2:15-18.  Here, the inference that the BAS managers did *not* communicate with sales

26    representatives is stronger, because the FAC does not allege that BAS's sales during that period

27    were any different than usual.

28          Third, the FAC fails to particularize facts showing that BAS was motivated to advance an

- 16 -

alleged "common interest" with other broker-dealers.  Its allegation that BAS had an unspecified "tacit or express understanding" with unspecified "other auction dealers" (FAC ¶ 59) is pure speculation that the FAC does not support with a single example of BAS "monitor[ing] the actions of its competitors" or "communicat[ing] directly" with any of them.  (*Id.*)  *See, e.g.*, *Lory v. Ryan*, No. CV 07-2174, 2008 U.S. Dist. LEXIS 84478, at *11 (D. Ariz. Oct. 20, 2008) (speculative motive allegation insufficient); *cf. Twombly*, 550 U.S. at 553-54 (rejecting conscious-parallelism allegations absent supporting facts).  And the allegation would fail even if it were supported, because scienter cannot be inferred from allegations that a company was "motivated by concerns that are shared by *all* companies."  *In re Silicon Storage Tech., Inc. Sec. Litig.*, No. C 05-0295, 2006 U.S. Dist. LEXIS 14790, at *54-55 (N.D. Cal. Mar. 10, 2006).

2.  *There was no "opportunity" to commit fraud in view of abundant public disclosures and reports.*

Without a motive to commit fraud, the FAC's vague allegations that "BAS Took Advantage of the Opportunity to Manipulate the Market for BA ARS" prove nothing.  (FAC at 10:12.)  The circumstances surrounding this "opportunity," which arose because BAS allegedly "exercised near complete control over information associated with auctions" (*id.* ¶ 49; *see also id.* ¶ 50), were in fact disclosed to Aeroflex:  "BAS is likely to have an advantage over other bidders in that it would have knowledge of some or *all other orders* placed through it in that auction and, thus, could determine the rate and size of its order so as to ensure that its order is likely to be accepted in the auction and that the auction is likely to clear at a particular rate. . . ."  (RJN Ex. 4 at 1.)  *See In re Dot Hill*, 594 F. Supp. 2d at 1160 ("Disclosing the precise risks at issue 'negate[s] an inference of scienter.'") (quoting *In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1165 (C.D. Cal. 2007).  And "adverse trends in the credit markets or unfavorable news about BA ARS" were not matters about which only BAS had information.  (FAC ¶ 50.)  Beginning in September 2007—more than four months before Aeroflex's ARS purchases at issue—*Financial Week* reported that "[a]t least 60 auctions have failed in recent weeks," warning "[c]ompanies that have been using auction-rate securities to boost yields" that their cash may be "tied up for who knows how long."  (RJN Ex. 10.)  The next month, *The Wall Street Journal* called ARS "one of the

1   casualties of the credit-market turmoil." (*Id.* Ex. 11.)  And Fitch observed in December—a

2   month before Aeroflex bought the ARS it currently holds—that "[w]hile the auction markets

3   appeared to be insulated early on, by September, auction rate spreads began to widen and

4   continue to trade wide of historic levels." (*Id.* Ex. 9.)  Aeroflex concedes that these higher yields

5   were "an indicator of higher risk." (FAC ¶ 35.)

6             3.    *The "totality of circumstances" shows that market conditions—not fraud—*
             *caused Aeroflex's ARS auctions to fail.*

7
          Considering the FAC "holistically," the far more cogent and compelling inference is that

8   rapidly deteriorating market conditions caused the well-publicized risks of ARS to materialize,

9   rendering Aeroflex's ARS illiquid.  As the court held in *Citigroup*, this precludes a strong scienter

10   inference:

11             [T]he very market conditions—specifically the "subprime crisis"—
             that Plaintiff cites in his Complaint in connection with Defendants'
12             intent to continue receiving ARS-related fees, give rise to an
             opposing and compelling inference that Defendants only engaged in
13             bad (in hindsight) business judgments in connection with ARS, and
             did not engage in the alleged conduct with an intent to deceive
14             investors.

15   *Citigroup*, 2009 U.S. Dist. LEXIS 83046, at *20.  Other courts have likewise not hesitated to

16   dismiss similar fraud claims filed in the credit crisis's wake.  *See, e.g.*, *SunTrust Banks*, 2009 U.S.

17   Dist. LEXIS 88465, at *5 (rejecting scienter allegations amidst an "international financial crisis

18   [that] made it increasingly difficult for financial companies to maintain large holdings of auction

19   rate securities"); *Pittleman v. Impac Mortgage Holdings, Inc.*, No. CV 07-970, 2009 U.S. Dist.

20   LEXIS 18213, at *10 (C.D. Cal. Mar. 9, 2009) (rejecting scienter allegations depicting "a

21   company involved in a volatile industry at the onset of a long, destructive economic downturn").

22          This case is no different.  The FAC's references to the SEC Complaint's allegations depict

23   a few BAS employees' understandable concerns about ARS auctions, as the media reported on

24   financial tremors that were driving up credit costs in all sectors.  That shake-up ultimately

25   rendered all major financial institutions unable to support ARS auctions (and unable to support

26   many other traditional banking practices as the financial crisis deepened).[5]  Nowhere do the

27   _____
    [5]     (*See, e.g.*, Randall Smith, Serena Ng, and Carrick Mollenkamp, *New Villain in Market
28   Drama:  Commercial Paper—Banks Pressed to Sell Short-Term Investments*, Wall St. J., at C1
    (Aug. 17, 2007) (RJN Ex. 12) (stating that "the credit crunch" caused many financial institutions

1  handful of e-mails highlighted in the FAC show that BAS intentionally concealed from Aeroflex

2  known *facts* that auctions were "unsustainable" (FAC ¶ 53), including that BAS and other

3  financial institutions knew in advance that they would stop bidding in ARS auctions altogether

4  for the first time in nearly 25 years (*see id.* ¶ 90).  Not only is that fanciful theory not "cogent" or

5  "compelling" (as the PSLRA and Rule 9(b) require)—it's not even "plausible or reasonable"

6  (Rule 8's less stringent pleading requirement).  *Tellabs*, 551 U.S. at 314.

### III.   BAS'S ARS-RELATED DISCLOSURES PRECLUDE AEROFLEX'S REASONABLE RELIANCE.

9        Aeroflex cannot state a Section 10(b) claim unless it reasonably relied on BAS's alleged

10  conduct in purchasing ARS.  *See Binder v. Gillespie*, 184 F.3d 1059, 1065 (9th Cir. 1999).

11  Written disclosures about the allegedly concealed risks, however, preclude such reasonable

12  reliance as a matter of law.  *See Starr v. Georgeson S'holder, Inc.*, 412 F.3d 103, 109 (2d Cir.

13  2005) ("An investor may not justifiably rely on a misrepresentation if, through minimal diligence,

14  the investor should have discovered the truth."); *Hunt v. Alliance N. Am. Gov't Income Trust,*

15  *Inc.*, 159 F.3d 723, 730 (2d Cir. 1998) (affirming securities-fraud claims' Rule 12(b)(6) dismissal

16  because "[i]n light of . . . disclaimers, no reasonable investor could have been misled . . . as to the

17  nature of his investment"); *Kenney v. Deloitte, Haskins & Sells*, No. C 91-590, 1992 U.S. Dist.

18  LEXIS 14600, at *10-11 (N.D. Cal. Sept. 1, 1992) (deeming reliance unreasonable as a matter of

19  law "given the ample warnings"); *Hudson v. Sherwood Sec. Corp.*, No. C 86-20344, 1989 U.S.

20  Dist. LEXIS 10474, at *4-5 (N.D. Cal. May 9, 1989) ("In light of the information admittedly

---

22  to withdraw from market for "[c]ommercial paper, the usually humdrum market for short-term
debt held by money-market funds and used by companies to finance their operations"); *id.* Ex. 8

23  ("In recent months, banks and investment banks have written off tens of billions of dollars of
illiquid, hard-to-value mortgage-related securities because of the credit crisis that began with

24  subprime mortgages and spread through the credit markets. . . .  It appears likely that companies
in other sectors will soon start to feel the pain of credit-crunch writedowns, and the types of
financial instruments affected could move beyond mortgage securities."); Yalman Onaran,

25  *JPMorgan Agrees to Buy Bear Stearns for $240 Million*, Bloomberg (Mar. 17, 2008) (RJN Ex.
13) (reporting that Bear Stearns ceased to exist "after a run on the company ended 85 years of

26  independence for Wall Street's fifth-largest securities firm"); Yalman Onaran and Christopher
Scinta, *Lehman Files Biggest Bankruptcy Case as Suitors Balk*, Bloomberg (Sept. 15, 2008)

27  ("Lehman Brothers Holdings Inc., the fourth-largest U.S. investment bank, succumbed to the
subprime mortgage crisis it helped create in the biggest bankruptcy filing in history.") (*id.* Ex.

28  14).)

DEFENDANTS' NOTICE OF MOTION,
MOTION TO DISMISS, AND MEMORANDUM OF
POINTS AND AUTHORITIES  C08-05245 JSW

1   supplied to plaintiff, the clear and repeated warnings in the subscription agreements, plaintiff's

2   relative sophistication, and the inadequacy of factual support, the court finds plaintiff has not

3   sufficiently pleaded the element of justifiable reliance.").

4         Thus, Aeroflex cannot sustain its securities-fraud claim by turning a blind eye to (i) risk

5   disclosures it received by e-mail and on BAS's website, and (ii) publicly available offering

6   memoranda for ARS that it purchased.  (*See supra* at 2-4.)  Those materials disclosed the very

7   conduct that forms the basis of the FAC:

| Alleged Misconduct | Disclosures in Request for Judicial Notice |
|---|---|
| •   "BAS failed to disclose to Plaintiff that it *invariably placed support bids* in every auction for which it was the sole or lead auction dealer . . . *as necessary to prevent auction failures.*" (FAC ¶ 29; *see also id.* ¶¶ 27, 40.)<br><br>• "BAS was able to place support bids and prevent auctions from failing because *it was aware of the other bids* in the auctions and could place its own bids *after the bidding deadline for other investors.*  This fact was concealed from Plaintiff."  (FAC ¶ 28.) | • "In connection with any particular auction, BAS is permitted, but is not obligated, to *submit orders for its own account* either as a bidder or as a seller, and *routinely does so in its sole discretion;* even after obtaining *knowledge of some or all of the other orders* submitted through it. . . .  Such bids submitted by BAS *may be designed to prevent a Failed Auction. . . .*"  (Ex. 4 at 1; *see also* Ex. 5; Ex. 1 at 21.)<br><br>• "Notwithstanding the BAS Auction Order Submission Deadline, the BAS Auction Desk may submit its own order in any Auction *at any time until the closing time* for the particular Auction."  (Ex. 4 at 2; *see also* Ex. 5.) |
| • "The placement of such support bids was done pursuant to a *tacit understanding among BAS and the issuers* of BA ARS that the auction dealer would act to prevent auction failures."  (FAC ¶ 26.) | • "In connection with any issue of auction rate securities, BAS may serve as *underwriter . . . .*  [F]or any given auction, BAS may have *different or conflicting interests* (i.e. since *it is appointed and paid by the issuer* or other obligated party to serve as Broker/Dealer in the auction, an interest in a lower clearing rate *to benefit its issuer or other obligated party client.*" (Ex. 4 at 3; *see also* Ex. 5; Ex. 1 at 21.) |
| • "BAS *described BA ARS as highly liquid, safe investments similar to money market funds because of the functioning of the market in these securities,* creating the perception that BA ARS were readily liquid alternatives to cash investments."  (FAC ¶ 38.)<br><br>• "BAS formulated a *plan to withdraw its support of the auction rate securities market* collectively with other major auction dealers."  (FAC ¶ 42.) | • "*Investors should not assume that BAS will place a bid* in any particular auction, or *that Failed Auctions or unfavorable auction rates will not occur.*" (Ex. 4 at 1; *see also* Ex. 5; Ex. 1 at 22 ("A Broker-Dealer is not obligated to continue to place such Bids in any particular Auction to prevent an Auction Failure . . . .  Investors should not assume that the Broker-Dealer will place Bids or that Auction Failures will not occur.").)<br><br>• "Auction Failures are possible, *especially . . . if a market disruption were to occur, or if, for any reason, the Broker-Dealers were unable or unwilling to bid.*"  (Ex. 1 at 23.)<br><br>• "BAS provides *no assurance as to the outcome of any Auction.*"  (Ex. 4 at 3; *see also* Ex. 5.)<br><br>• "[T]here can be *no assurance that a secondary market for the Auction Rate Bonds will develop . . . .*"  (Ex. 1 at 23.) |

DEFENDANTS' NOTICE OF MOTION,
MOTION TO DISMISS, AND MEMORANDUM OF
POINTS AND AUTHORITIES  C08-05245 JSW

| Alleged Misconduct | Disclosures in Request for Judicial Notice |
|---|---|
| • "For each auction, BAS knew all the bids that had been placed by both holders and prospective buyers of the securities.  Armed with this information, *BAS placed buy bids at specified rates and in sufficient amounts that ensured the auction would clear at those rates.*"  (FAC ¶ 32.) | • "Each Broker-Dealer *routinely places bids in auctions generally for its own account to acquire Auction Rate Bonds for its inventory . . . to prevent an auction from clearing at a rate that the Broker-Dealer believes does not reflect the market for such Auction Rate Bonds.*"  (Ex. 1 at 21; *see also id.* at 22.) |
| • "By intervening in the auctions, *BAS not only set the clearing rate but also added BA ARS to its own inventory*.  BAS then reduced the excess inventory between auction periods by selling BA ARS at the clearing rate that BAS had established at the previous auction."  (FAC ¶ 34.) | • "Bidding by BAS is likely to *affect the auction results* in one or both of the following ways:<br><br>- the auction clearing rate is likely to be higher or lower than the *clearing rate that would have prevailed* if BAS had not bid . . .<br><br>- the *allocation of securities is likely to be affected*, including the displacement of prospective holders."  (Ex. 4 at 1.) |
|  | • BAS provides no assurance as to the outcome of any Auction; *nor does BAS provide any assurance that any bid will be accepted or that the auction will clear at a rate that a bidder considers acceptable.* Bids may be rejected or may be only partially filled, and the rate on any securities retained may be lower than the bidder expected."  (Ex. 4 at 3.) |

In view of these disclosures, Aeroflex could not have reasonably believed "that BA ARS were readily liquid investments and that the auction rate securities market functioned by the natural interplay of supply and demand."  (FAC ¶ 29.)  Indeed, *The Wall Street Journal* reported as early as March 2005 that "investors rely on the broker-dealers who conduct the auctions to provide liquidity" (RJN Ex. 2), and the SEC announced in 2006 that such participation was not prohibited "when properly disclosed" (*id.* Ex. 3 at 6 n.6).

## IV.   THE FAC FAILS TO PLEAD ADEQUATELY THAT BAS'S CONDUCT CAUSED AEROFLEX'S ALLEGED LOSS.

"[T]he purpose of the federal securities laws is 'not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause.'"  *In re Leapfrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1041 (N.D. Cal. 2007) (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005)).  Accordingly, a Section 10(b) complaint must sufficiently plead "loss causation," or a proximate causal connection between the alleged fraud and the investor's economic loss.  *See, e.g.*, *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1063 (9th Cir. 2008) ("[T]he complaint must allege that the practices that the plaintiff contends are fraudulent . . . caused the resulting

1   losses."); *Glenbrook Capital*, 2009 U.S. Dist. LEXIS 30745, at *39 ("[T]o allege loss causation a

2   plaintiff must show the actual economic loss suffered and the causal connection between that loss

3   and the misrepresentation or omission.").

4      In that regard, a complaint must isolate the loss attributable to fraud from the loss

5   resulting from market-wide conditions.  *See Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174

6   (2d Cir. 2005) ("[W]hen the plaintiff's loss coincides with a marketwide phenomenon causing

7   comparable losses to other investors, the prospect that plaintiff's loss was caused by the fraud

8   decreases.").  For example, after the Internet-stock bubble burst in the spring of 2000, an ensuing

9   flurry of lawsuits alleged that issuers, analysts, and others in the Internet sector had committed

10  rampant and undetected fraud.  Courts routinely dismissed such claims as hindsight attempts to

11  blame defendants for a market-wide collapse.  *See, e.g.*, *In re Merrill Lynch & Co. Research*

12  *Reports Sec. Litig.*, No. 02 Civ. 9690, 2008 U.S. Dist. LEXIS 44344, at *22 (S.D.N.Y. June 4,

13  2008) ("[Plaintiff's] failure to allege that his losses were due to the purported fraud, rather than

14  the market-wide collapse of the Internet sector, also requires dismissal of his Complaint.");

15  *Leykin v. AT&T Corp.*, 423 F. Supp. 2d 229, 246 (S.D.N.Y. 2006) (dismissing complaint that did

16  not isolate alleged fraud from other causes of plaintiff's loss, such as market-wide Internet stock

17  collapse); *In re Acterna Corp. Sec. Litig.*, 378 F. Supp. 2d 561, 588 (D. Md. 2005) (dismissing

18  complaint for failure to plead loss causation because telecommunications company's stock-price

19  decline occurred during general industry downturn).

20     The same logic requires this action's dismissal.  As described above, ARS auctions failed

21  not because of broker-dealers' bidding practices—which were publicly known since at least

22  2006—but because the economic crisis "spread through the credit markets" in 2007–2008 (RJN

23  Ex. 8), affecting ARS as well as other historically safe and liquid investments.  (*See supra* at 4-5.)

24  Thus, like other recent complaints that have tried to blame the recession on a financial institution,

25  the FAC cannot plead loss causation.  *See Healthcare Fin. Group, Inc. v. Bank Leumi USA*, No.

26  08 Civ. 11260, 2009 U.S. Dist. LEXIS 101948, at *14 (S.D.N.Y. Oct. 26, 2009) (dismissing with

27  prejudice complaint that did "not plausibly allege[] that the collapse of the auction rate securities

28  market . . . was caused by the revelation of the information that Bank Leumi had allegedly

- 22 -

1    misrepresented or suppressed"); *see also Luminent Mortgage Capital, Inc. v. Merrill Lynch &*

2    *Co.*, No. 07-5423, 2009 U.S. Dist. LEXIS 74382, at *49-51 (E.D. Pa. Aug. 20, 2009) (concluding

3    that given "unprecedented deterioration in market conditions," plaintiffs' allegations did not

4    "allow the Court to apportion any losses between Defendants' misrepresentations and the

5    significant declines in market value for mortgage-backed securities"); *cf. First Nationwide Bank*

6    *v. Gelt Funding Corp.*, 27 F.3d 763, 772 (2d Cir. 1994) ("[W]hen the plaintiff's loss coincides

7    with a marketwide phenomenon causing comparable losses to other investors, the prospect that

8    the plaintiff's loss was caused by the fraud decreases.").

9         The FAC also fails to plead loss causation because it does not allege that BAS's

10   withdrawal from ARS auctions alone caused Aeroflex's alleged losses, absent other broker-

11   dealers' market-wide withdrawal.  *See Bennett v. H&R Block Fin. Advisors*, Inc., No. C 04-4848,

12   2005 U.S. Dist. LEXIS 25273, at *11 (N.D. Cal. Oct. 27, 2005) (dismissing Section 10(b)

13   complaint for failure to plead loss causation where plaintiffs could not allege that their broker-

14   dealer's actions caused their losses in Enron bonds).  In that regard, the FAC affirmatively alleges

15   that BAS was just one of many auction dealers that market conditions forced to stop supporting

16   auctions.  (*See* FAC ¶ 43 (referring to "BAS and other major auction dealers").)

17   **V.    THE SECTION 20(a) CLAIM AGAINST BAC FAILS BECAUSE THE PRIMARY
18         SECTION 10(b) CLAIMS FAIL.**

19        Section 20(a) claims against "control persons" first require a primary Exchange Act

20   violation.  *See Glenbrook Capital*, 2009 U.S. Dist. LEXIS 30745, at *51-52 ("Where a plaintiff

21   asserts a Section 20(a) claim based on an underlying violation of Section 10(b), the pleading

22   requirements for both violations are the same.").  Because the FAC has not pleaded such a

23   violation, Count II should be dismissed.

24   **VI.   AEROFLEX'S COMMON-LAW CLAIMS SHOULD BE DISMISSED.**

25        After dismissing federal securities claims at the pleadings stage, courts in this circuit

26   routinely dismiss pendent state-law claims for which only supplemental jurisdiction exists under

27   28 U.S.C. § 1367.  *See, e.g., Foster v. Wilson*, 504 F.3d 1046, 1051-52 (9th Cir. 2007) (affirming

28   district court's decision to decline supplemental jurisdiction after dismissing Section 10(b) claim);

1   *In re Textainer P'ship Sec. Litig.*, No. C 05-969, 2007 U.S. Dist. LEXIS 5283, at *37 (N.D. Cal.

2   Jan. 10, 2007) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the

3   balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-

4   law claims."); *Verona Partners, LLC v. Tenet Capital Partners Convertible Opportunities Fund*

5   *LP*, No. C 05-5369, 2006 U.S. Dist. LEXIS 69488, at *41-42 (N.D. Cal. Sept. 18, 2006) (same).

6   Such is the case here.  (*See* FAC ¶ 9.)  "No discovery has been taken.  The parties have no

7   investment in this Court beyond the instant motion[]."  *Williams v. Berkshire Fin. Group, Inc.*,

8   491 F. Supp. 2d 320, 329 (E.D.N.Y. 2007).  Accordingly, the Court should decline to exercise

9   supplemental jurisdiction over Aeroflex's common-law fraud and rescission claims (Counts III

10   and IV).

11          Even if the Court were to exercise supplemental jurisdiction, it should dismiss Aeroflex's

12   two common-law claims.  First, Aeroflex premises its common-law-fraud claim (Count III) on the

13   same conclusory allegations of "material misrepresentations and omissions" as the federal claim.

14   (FAC ¶ 122.)  As demonstrated above (*see supra* at 6-9), Aeroflex has not alleged a single fact to

15   support those allegations, let alone the particularized facts that Rule 9(b) requires.  *See, e.g.*,

16   *Oestreicher v. Alienware Corp.*, 544 F. Supp. 2d 964, 968 (N.D. Cal. 2008) ("It is well

17   established that Rule 9(b)'s requirement that allegations of fraud be pled with particularity applies

18   to state-law causes of action before a federal court.").  Second, Aeroflex's Count IV for

19   "Rescission against Defendants" does "not state a claim upon which relief could be granted

20   because rescission is a remedy rather than a cause of action."  *Crossen v. Bernstein*, No. 91 Civ.

21   3501, 1994 U.S. Dist. LEXIS 8388, at *16 (S.D.N.Y. June 23, 1994).  And in any event, Count

22   IV is also premised on BofA's alleged "fraudulent acts and practices" (FAC ¶ 125), which

23   Aeroflex has not pleaded with particularity for the reasons described above.  (*See supra* at 6-9.)

24   *See Mills v. Everest Reinsurance Co.*, 410 F. Supp. 2d 243, 253 (S.D.N.Y. 2006) (concluding that

25   rescission claim based on fraud allegations "is both duplicative and not pled with [Rule 9(b)]

26   particularity").

27

28

1     **VII.   THE FAC SHOULD BE DISMISSED WITH PREJUDICE.**

2     　　　Leave to amend should be denied when it would be futile.  *See In re Vantive Corp. Sec.*

3     *Litig.*, 283 F.3d 1079, 1097 (9th Cir. 2002).  Although Aeroflex recently amended its complaint

4     to incorporate allegations from both the *Bondar* and SEC ARS-related complaints against BofA,

5     the FAC nevertheless fails to satisfy Rule 9(b)'s and the PSLRA's heightened pleading

6     requirements.  *See McCasland*, 2009 U.S. Dist. LEXIS 59996, at *24 (noting that district court's

7     discretion to deny leave to amend is particularly broad where plaintiff has previously amended

8     the complaint); *Pittleman*, 2009 U.S. Dist. LEXIS 18213, at *10 (dismissing complaint without

9     leave to amend because plaintiffs could not plead scienter in "case . . . about a company involved

10    in a volatile industry at the onset of a long, destructive economic downturn").  The FAC should

11    therefore be dismissed with prejudice.

12                                   **CONCLUSION**

13    　　　The PSLRA and Rule 9(b) are designed to prevent plaintiffs like Aeroflex from attributing

14    investment losses to fraud in hindsight.  Like other courts around the country that have dismissed

15    fraud complaints arising from the widespread ARS auction failures, the FAC is devoid of

16    particularized facts that could establish (i) misrepresentations or manipulative conduct on which

17    Aeroflex could have reasonably relied, (ii) a cogent and compelling inference that BAS acted

18    with fraudulent intent, and (iii) that BAS's alleged conduct alone—rather than an unprecedented

19    marketwide phenomenon—caused ARS auctions to fail.  The FAC should therefore be dismissed

20    with prejudice.

Dated:  February 11, 2010     Respectfully submitted,

             O'MELVENY & MYERS LLP

             By: /s/ Debra S. Belaga

             Debra S. Belaga (S.B. #083237)

             Aaron M. Rofkahr (S.B. #227008)

             Two Embarcadero Center, 28th Floor

             San Francisco, California 94111

             Telephone: (415) 984-8700

             Facsimile: (415) 984-8701

             Email:  dbelaga@omm.com

                  arofkahr@omm.com

             Jonathan Rosenberg (admitted *pro hac vice*)

             B. Andrew Bednark (admitted *pro hac vice*)

             7 Times Square

             New York, New York  10036

             Telephone: (212) 326-2000

             Facsimile: (212) 326-2061

             Email:  jrosenberg@omm.com

                  abednark@omm.com

             Robert M. Stern (admitted *pro hac vice*)

             1625 Eye Street, NW

             Washington, DC  20006

             Telephone: (202) 383-5300

             Facsimile: (202) 383-5414

             Email:  rstern@omm.com

             *Attorneys for Defendants*

- 26 -